# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

KECHI TOWNSHIP and EMPLOYERS
MUTUAL CASUALTY COMPANY
Plaintiffs/Appellants/Cross-Appellees,

v.

FREIGHTLINER, LLC n/k/a DAIMLER
TRUCKS NORTH AMERICA LLC,
Defendant/Appellee/Cross-Appellant.

Case Nos. 12-3118
and 12-3134

_____

Appeal From The United States District Court for the District of Kansas
Honorable Monti L. Belot, United States District Judge
District Court Case No. 10-1051-MLB

_____

## APPELLEE'S PRINCIPAL AND RESPONSE BRIEF
_____

November 13, 2012

**ORAL ARGUMENT IS REQUESTED**
**THIS DOCUMENT HAS BEEN CONVERTED TO NATIVE PDF**

Kenneth R. Lang
Matthew K. Holcomb
HINKLE LAW FIRM LLC
8621 E. 21st Street North, Suite 200
Wichita, Kansas 67206-2991
Telephone: 316-267-2000
*Attorneys for Defendant/Appellee*
E-mail: klang@hinklaw.com
         mholcomb@hinklaw.com

Alan Epstein
HALL & EVANS, L.L.C.
1125 17th Street, Suite 600
Denver, Colorado  80202
Telephone: 303-628-3300
*Co-counsel for Defendant/Appellee*
E-mail: epsteina@hallevans.com

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Freightliner, LLC n/k/a Daimler Trucks North America LLC is a Delaware Limited Liability Company comprised of a sole member, Daimler North America Corporation.  Daimler North America Corporation is wholly owned by Daimler AG, a German publicly traded company.  Neither Daimler Trucks North America LLC, Daimler North America Corporation nor Daimler AG are US publicly traded companies, nor does any US publicly traded company own 10% or more of Daimler Trucks North America LLC.

# TABLE OF CONTENTS

**PAGE**

I.    STATEMENT OF ISSUES ..................................................................1

II.   STATEMENT OF THE CASE ...........................................................1

III.  STATEMENT OF FACTS .................................................................2

IV.   SUMMARY OF ARGUMENT ..........................................................4

V.    ARGUMENT ......................................................................................7

      A.    The Trial Court Erred By Allowing Plaintiffs' Claim for
             Strict Liability Defective Design to Go to The Jury Because
             Plaintiffs Lacked Sufficient Evidence to Establish a Design
             Defect Present in the Incident Truck at the Time It Left the
             Manufacturer that Caused Plaintiffs' Damages. ...................................7

      B.    The Trial Court Improperly Allowed Mr. Martin's and Mr.
             Birmingham's Testimony to Be Considered by the Jury....................24

      C.    The Trial Court Improperly Allowed Mr. Day to Testify
             Pursuant to Fed. R. Evid. 701 as the Alleged "Owner" of
             the Damaged Property. .......................................................................34

      D.    Even When Allowing Mr. Day to Testify As the "Owner,"
             the Trial Court Properly Mandated He Present Evidence
             of Fair Market Value Immediately Prior to and After the
             Fire, Which Mr. Day Could Not and Did Not Do..............................51

VI.   CONCLUSION..................................................................................57

STATEMENT REGARDING ORAL ARGUMENT ...........................................58

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)(B)............58

CERTIFICATION OF DIGITAL SUBMISSION...................................................58

# TABLE OF AUTHORITIES

**PAGE**

## CASES

*Acker v. Burlington N. & Santa Fe R.R. Co.*,
    347 F. Supp. 2d 1025 (D. Kan. 2004) ............................................................28

*Airight Sales, Inc. v. Graves Truck Lines, Inc.*,
    207 Kan. 753, 486 P.2d 835 (1971)................................................................52

*Asplundh Mfg. Div. v. Benton Harbor Eng.*,
    57 F.3d 1190 (3d Cir. 1995) ...........................................................................42

*Booth v. Black & Decker, Inc.*,
    166 F. Supp. 2d 215 (E.D. Pa. 2001)..............................................................29

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579, 113 S.Ct. 2786,
    125 L.Ed.2d 469 (1993).................................................. 24, 25, 26, 33, 34, 50

*Delaney v. Deere & Co.*,
    268 Kan. 769, 999 P.2d 930 (2000)..................................................................8

*Dieker v. Case Corp.*,
    276 Kan. 141, 73 P.3d 133 (2003)..................................................................15

*Dodge v. Cotter Corp.*,
    328 F.3d 1212 (10th Cir. 2003) ......................................................................25

*Dorn v BMW of North America, LLC.*,
    No. 09-1027-WEB, 2010 WL 3913226 (D. Kan. Sept. 30, 2010)..........16, 17

*Emigh v. Andrews*,
    164 Kan. 732, 191 P.2d 901 (1948).................................................................19

*Erie R.R. v. Tompkins*,
    304 U.S. 64 (1938)..........................................................................................47

*Farmers Ins. Co.*,
219 Kan. at 691, 549 P.2d 1026, 1028 (1976)........................................14, 17

*Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.*,
394 F.3d 1054 (8th Cir. 2005) ......................................................29

*GE Co. v. Joiner*,
522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) ................................25

*Goebel v. Denver & Rio Grande Western R.R. Co.*,
215 F.3d 1083 (10th Cir. 2000) ....................................................28

*Halley v. Barnabe*,
271 Kan. 652, 24 P.3d 132 (2001)..................................................50

*Hanna v. Plumer*,
380 U.S. 460 (1965)................................................................47

*Hoang v. Funai Corp., Inc.*,
652 F. Supp. 2d 564 (M.D. Pa. 2009)................................................29

*Hysten v. Burlington Northern Santa Fe Ry. Co.*,
530 F.3d 1260 (10th Cir. 2008) .....................................................7

*Interlake Iron Corp. v. NLRB*,
131 F.2d 129, 133 (7th Cir. 1942) ..................................................20

*Jacobson v. Ford Motor Co.*,
199 Kan. 64, 427 P.2d 621 (1967)................................................15, 16

*James River Ins. Co. v. Rapid Funding, LLC*,
658 F.3d 1207 (10th Cir. 2011) ................................ 40, 45, 46, 47, 48, 49, 50

*Jenkins v. Amchem Prods., Inc.*,
256 Kan. 602, 886 P.2d 869 (1994)...............................................8, 23

*Kiser v. Phillips Pipe Line Co.*,
141 Kan. 333, 41 P.2d 1010, *Syllabus* (1935 ) ..............................................51

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ..............................25

*Mays v. Ciba-Geigy Corp.*,
233 Kan. 38, 661 P.2d 348 (1983)..................................................8, 19, 22, 23

*McCroy v. Coastal Mart, Inc.*,
207 F. Supp. 2d 1265 (D. Kan. 2002) ...........................................................23

*McKenzie v. New York Life Ins. Co.*,
153 Kan. 439, 112 P.2d 86 (1941).................................................................19

*Mehus v. Emporia State Univ.*,
222 F.R.D. 455 (D. Kan. 2004) .....................................................................25

*NLRB v. Meinholdt Mfg. Inc.*,
451 F.2d 737 (10th Cir. 1971) (emphasis supplied in *Meinholdt*) ..........19, 20

*Pekarek v. Sunbeam Products, Inc.*,
672 F. Supp. 2d 1161 (D. Kan. 2008) ...........................................................19

*Randolph v. Collectramatic, Inc.*,
590 F.2d 844 (10th Cir. 1979) .......................................................................42

*Reed v. Keating of Chicago, Inc.*,
No. 87-1694-C, 1989 WL 159343 (D. Kan. Dec. 13, 1989)...........................8

*State v. Blomquist*,
39 Kan. App. 2d 101 ( 2008) .........................................................................49

*State v. Rice*,
261 Kan. 567, 932 P.2d 981 (1997)................................................................19

*State v. Struzik*,
269 Kan. 95 (2000)) (emphasis added...........................................................49

*Truck Ins. Exchange v. Magnetek, Inc.*,
    360 F.3d 1206 (10th Cir. 2004) ...................................................25

*Ultimate Chem. Co.*,
    232 Kan. at 729, 658 P.2d at 1011 ...............................................51

*Ultimate Chem. Co. v. Surface Transp. Int'l*,
    232 Kan. 727 (1983) .............................................................50, 51

*United States v. Allen*,
    603 F.3d 1202 (10th Cir. 2010) ...................................................24

*United States v. Smith*,
    640 F.3d 358 (D. C. Cir. 2011) ...............................................43, 45

*United States v. Sowards*,
    370 F.2d 87 (10th Cir. 1966) .......................................................53

*United States v. Zhou*,
    No. 06-cr-286, 2008 WL 4067103 (D.N.J. 2008) .........................29

*Wilcheck v. Doonan Truck & Equip., Inc.*,
    220 Kan. 230, 552 P.2d 938 (1976) ...............................................8

*Williams v. Amoco Prod. Co.*,
    241 Kan. 102, 734 P.2d 1113 (1987) ............................................51

## STATUTES AND OTHER AUTHORITIES

Fed.R.App.P.32(a)(7)(B)(iii) ......................................................58

Fed.R. Evid. 701 ..................................................... 1, 40, 41, 42, 43, 44,
                                             45, 47, 48, 49, 50

Fed. R. Evid. 702 ............................................. 24, 25, 29, 34, 40, 41, 42,
                                           43, 44, 45, 46, 50, 57

Rules Enabling Act, 28 U.S.C. § 2072(b) ................................................................ 48

*Comment, Torts-Product Liability-Strict Liability for Defect in Design,* 43
    Mo. L. Rev. 601, 602 (1978) ........................................................................... 9

Kansas Statutes Annotated § 80-101 et seq ...................................................... 39, 40

## PRIOR OR RELATED APPEALS

There are no prior or related appeals.

# I.  STATEMENT OF ISSUES

A.     Whether the trial court erred by allowing plaintiffs' claim for strict liability defective design to go to the jury because plaintiffs lacked sufficient evidence to establish a design defect present in the incident truck at the time it left the manufacturer that caused plaintiffs' damages.

B.     Whether the trial court improperly allowed Mr. Martin's and Mr. Birmingham's testimony to be considered by the jury.

C.     Whether the trial court improperly allowed Mr. Day to testify pursuant to Fed.R. Evid. 701 as the alleged "owner" of the damaged property.

D.     Assuming Mr. Day could properly testify as the "owner," whether the trial court properly mandated he present evidence of fair market value immediately prior to and after the fire, which Mr. Day could not and did not do.

# II.  STATEMENT OF THE CASE

This is a product liability action, wherein Plaintiffs sought to recover for fire damage to Kechi Township's shop building and its contents.  After a five-day trial, the jury returned a verdict for Plaintiffs, finding that a design defect existed and awarded Plaintiffs damages in the amount of $21,000.00.  (Aplt. App. Vol. 1 at 128).  The Trial Court entered judgment on the jury's verdict.  Aplt. App. Vol. 1 at 130).

### III.  STATEMENT OF FACTS

In the early morning hours of December 19, 2007, a fire broke out in Plaintiff Kechi Township's shop building.  Plaintiffs' sole cause of action proceeding to trial was based on strict liability for defective design.  Plaintiffs claimed the fire originated in its Freightliner dump truck as a result of a defect in the truck.  Specifically, Plaintiffs' defect allegation concerned the attachment of the positive battery cable, the alternator output cable, and the cab power cable to the starter solenoid with the use of a bus bar and cap nut.  Plaintiffs alleged that the use of the bus bar and cap nut constituted a design defect that resulted in a loose connection at the starter solenoid, which component parts and loose connection was an alleged cause of the fire.

The incident truck is a Model FL-70 2000 Freightliner truck.  (Aplt. App. Vol. 2 at 243-245).  On December 19, 2007, at or about 12:15 a.m., a fire occurred in Kechi Township's shop building located at 900 East 69th Street North, Wichita, Kansas.  (Aplt. App. Vol. 2 at 252-253).  At the time of the fire, the Freightliner truck was parked inside the shop building.  (Aplt. App. Vol. 2 at 286-278).  On December 18, 2007, the day prior to the fire, the Freightliner truck was last operated at approximately 2:45 p.m. to 3:00 p.m. when it was parked inside the

shop building by a Kechi Township employee.  (Aplt. App. Vol. 2 at 286-289).
The fire completely destroyed the Kechi Township shop, including all contents.

Kechi Township employees used, among other things, a wood burning stove
located inside of the shop building to heat the shop building.  (Aplt. App. Vol. 2 at
285-289).  The wood burning stove was operated on December 18, 2007.  (Aplt.
App. Vol. 2 at 286-289).  On the day prior to the fire, before leaving work for the
day at approximately 3:15 p.m., Plaintiff's employee at the time, Jacob Cox,
removed hot ashes from a wood burning stove into a plastic trash container.  (Aplt.
App. Vol. 6 at 1036-1038).

Tavis D. Leake, Captain with the Sedgwick County Fire Department District
#1, was the cause and origin investigator assigned to the incident fire.  (Aplt. App.
Vol. 6 at 1019-1021).  Captain Leake interviewed Jacob Cox, Kechi Township's
employee at the time, who admitted that he had disposed of hot ashes into the
plastic container right before leaving the shop building for the day.  (Aplt. App.
Vol. 6 at 1037-1038).  Mr. Cox further reported that after he removed the ashes, he
placed additional logs into the stove and started the fire before he left.  (Aplt.
App. Vol. 6 at 1037-1038).  Curtis McColm, another employee, also stated that it was
not uncommon for the wood burner to be burning all night and throughout the day.

(Aplt. App. Vol. 6 at 1037).  Captain Leake concluded that the fire originated near the trash container and wood burning stove.  (Aplt. App. Vol. 6 at 1043-1044).

## IV.  SUMMARY OF ARGUMENT

Plaintiffs retained two experts in this case, James Martin, P.E., and Don Birmingham, DFEI.  Mr. Martin opined that the cause of the fire was a loose connection near the starter that created resistance heating sufficient to ignite nearby combustible materials.  (Aplt. App. Vol. 3 at 530-531).  However, and importantly, neither Mr. Martin nor Mr. Birmingham opined that the phenomenon that they identified was attributable to an alleged design defect either within their written reports, depositions, or at trial.  In fact, the word defect did not appear in their written opinions or trial testimony, nor should it have, as they neither consulted, evaluated, nor reviewed any of Defendant's design drawings for the incident truck.  Plaintiffs failed to offer expert testimony or evidence establishing design defect; therefore, Plaintiffs' case should have never reached the jury.

Plaintiffs' defect allegations against Defendant never should have reached the jury because Plaintiffs lacked evidence showing how the use and installation of the bus bar and cap nut constitute a design defect under Kansas law.  Plaintiffs' expert witnesses failed to review or analyze a single design drawing for the Freightliner truck, and Plaintiffs failed to depose even a single witness from

Defendant to inquire about Defendant's design processes. Plaintiffs thus lacked sufficient evidence relating to Defendant's design of the truck and causation of the fire, which void left nothing but speculation. Moreover, in Plaintiffs' reliance on circumstantial evidence, they failed to eliminate other reasonable causes of the fire, primarily the likelihood that the fire could have originated in the plastic trash container wherein Plaintiffs' employee emptied hot ashes from a wood burning stove located in the shop building, as concluded by the fire department. Absent such evidence, Plaintiffs' claims should have never been submitted to the jury.

Additionally, Plaintiffs' experts failed to pass *Daubert* requirements, and their opinions and testimony should have been precluded from trial. Mr. Martin, Plaintiffs' causation expert, failed to review, evaluate, or analyze a single design drawing relating to Defendant's design of the incident truck, yet he was allowed to criticize Defendant's design at trial. (Aplt. App. Vol. 7 at 1256-1258). Moreover, both Mr. Martin and Mr. Birmingham failed to eliminate other reasonable causes of the fire, including the facts surrounding the disposal of hot ashes and coal into the plastic trash container. On January 4, 2012, the Court conducted a hearing on Defendant's *Daubert* motions directed towards both Mr. Martin and Mr. Birmingham. (Aplt. App. Vol. 7 at 1139-1265). While the Court correctly struck Mr. Birmingham's opinion relating to the cable insulation catching fire as the fire

5

origin, he improperly allowed him to offer testimony that the origin of the fire was at the location of the starter solenoid where the loose cap nut was observed. (Aplt. App. Vol. 7 at 1198-1199; Aplt. App. Vol. 1 at 39-40; Aplt. App. Vol. 1 at 41-45). The Court also incorrectly allowed Mr. Martin to testify as to his causation and design defect opinions. (Aplt. App. Vol. 1 at 41-45).

To prove up their damages, Plaintiffs offered the lay witness testimony of Kechi Township's employee, James Day, a shop maintenance supervisor. (Aplt. App. Vol. 2 at 256-267). Mr. Day is not an expert appraiser, nor is he an insurance adjuster. Mr. Day initially offered only replacement cost value evidence, in direct contradiction to Kansas law, which requires evidence of fair market value immediately before and immediately after the fire. (Aplt. App. Vol. 2 at 256-267). Upon Defendant's initial objection, the Trial Court properly ruled that Plaintiffs must present evidence of fair market value in accordance with Kansas law. (Aplt. App. Vol. 2 at 267-279). Plaintiffs were provided numerous opportunities to restore their witness, Mr. Day; however, he never provided sufficient evidence of fair market value, save a John Deere Gator and some new tools, all purchased shortly before the fire. Accordingly, the Trial Court properly excluded Mr. Day's speculative and irrelevant testimony, and his proffer of testimony for the real estate, that was based on hearsay.

Although the Trial Court correctly mandated evidence of fair market value, it erred by allowing Mr. Day to testify as the "owner" of the property. As a corporate body and politic, Kechi Township's property was not owned by Mr. Day. There is no support in Kansas statutory law permitting Mr. Day to testify as the owner. Nor is there support in Kansas substantive law or federal law. Accordingly, Mr. Day should not have been allowed to testify at all as to any property, and the Trial Court erred in so allowing him.

Assuming that Mr. Day was properly permitted to testify as a property "owner," the Trial Court correctly required that he present evidence of fair market value immediately prior to and after the fire.

## V. ARGUMENT

**A.** **The Trial Court Erred By Allowing Plaintiffs' Claim for Strict Liability Defective Design to Go to The Jury Because Plaintiffs Lacked Sufficient Evidence to Establish a Design Defect Present in the Incident Truck at the Time It Left the Manufacturer that Caused Plaintiffs' Damages.**

**Standard of Review**: This Court reviews *de novo* the denial of a motion for judgment as a matter of law. ***Hysten v. Burlington Northern Santa Fe Ry. Co.***, 530 F.3d 1260, 1269 (10th Cir. 2008).

\*  \*  \*

At trial, Plaintiffs' sole claim against Defendant was strict liability defective design.   To prevail on their claim, Plaintiffs must have presented a sufficient evidentiary basis to support a finding as to (1) whether there was a defect in Defendant's design of the incident truck; (2) whether the defect existed at the time the truck left the manufacturer; and (3) whether the defect caused Plaintiffs' damages.  *Jenkins v. Amchem Prods., Inc.*, 256 Kan. 602, 630, 886 P.2d 869, 886 (1994) (stating that a plaintiff must show proof that "(1) the injury resulted from a condition of the product; (2) the condition was an unreasonably dangerous one; and (3) the condition existed at the time it left the defendant's control"); *see also Wilcheck v. Doonan Truck & Equip., Inc.*, 220 Kan. 230, 235, 552 P.2d 938, 942 (1976); *Mays v. Ciba-Geigy Corp.*, 233 Kan. 38, 54, 661 P.2d 348, 360 (1983). "Kansas [] adheres to the consumer expectations test [] as the standard for measuring design defects in Kansas.  This test defines an unreasonably dangerous product as one which is 'dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.'" *Delaney v. Deere & Co.*, 268 Kan. 769, 788, 999 P.2d 930, 944 (2000).

"A design defect involves the whole line of products and is the result of the manufacturer's choice to adopt a particular design." *Reed v. Keating of Chicago,*

*Inc.*, No. 87-1694-C, 1989 WL 159343, at *1 (D. Kan. Dec. 13, 1989) (quoting

Comment, *Torts-Product Liability-Strict Liability for Defect in Design*, 43 Mo. L.

Rev. 601, 602 (1978)).  Plaintiffs lacked sufficient evidence to find (1) a defect in

Defendant's design, let alone what Defendant's design is or was; (2) this defect,

whatever it may be, existed at the time it left Defendant's control; (3) the defect

rendered the truck "unreasonably dangerous," and (4) that the defect caused

Plaintiffs' damages.  Accordingly, this case never should have reached the jury.  It

should have been dismissed at the summary judgment phase, at the close of

Plaintiffs' evidence (Aplt App. Vol. 5 p. 801), and in Defendant's Renewed

Motion for Judgment as a Matter of Law.  (Aplt. App. Vol. 1 at 131-147).

### 1. **No Design Defect In the Use of A Cap Nut and Bus Bar.**

Plaintiffs' design defect claim based on a loose cap nut and bus bar should

have never been considered by the jury because there was insufficient evidence at

trial that incorporation of a cap nut and bus bar into a design is in any way

defective.  Plaintiffs' expert, Mr. Martin, opined that the cap nut was his main

focus only because it was loose and presented two connections welded together.

(Aplt. App. Vol. 3 at 544-545).  Mr. Martin opined that this loose connection

caused excessive resistance heating where the two cables attached to the bus bar

underneath the cap nut.  (Aplt. App. Vol. 3 at 582).  This resistance heating in turn

allegedly caused the insulation on the bus bar to degrade/melt into nonexistence. (Aplt. App. Vol. 3 at 587).  Mr. Martin testified that the un-insulated bus bar, in a completely unidentified manner, somehow moved or "reposition[ed] itself" while the truck had been parked in the off position for hours, made contact with the metal frame of the truck (it is unknown where the bus bar allegedly made contact or how it moved to that place of contact in the first instance), which caused a short/fault. (Aplt. App. Vol. 3 at 587-589).  This short/fault then produced heat sufficient to start the fire, although Mr. Martin failed to identify the initial materials ignited or explain how the insulation became ignited when, under his own theory, it had already melted and degraded away into non-existence due to the heat from resistance heating.  (Aplt. App. Vol. 3 at 587-589).

Mr. Martin's opinion on the cause of the fire had nothing to do with the incidental use of a cap nut and bus bar.  Mr. Martin never opined that the incorporation of a cap nut and bus bar, in and of themselves, is somehow a defective design.  There was no evidence that the cap nut was somehow capable of slowly backing off of the bus bar terminal to create the loose connection complained of.  In fact, Mr. Martin opined that heat would not result in the cap nut backing off of the bus bar.  (Aplt. App. Vol. 4 at 641).  More importantly, Mr. Martin testified that he had no idea when the nut became loose, but "doubted" that

it was that way when it left Defendant's plant in North Carolina.  (Aplt. App. Vol. 4 at 620).  Simply stated, there were no allegations and no evidence in this case to support a finding that the cap nut and bus bar, in and of themselves, constituted a defective design.

Plaintiffs' ultimate complaint was the loose connection at the cap nut, but there was no evidence before the jury that Defendant's design specifically included a loose connection.  In fact, what circumstantial evidence Plaintiffs presented of Defendant's design indicated a tight connection at the cap nut on the bus bar terminal.  Mr. Martin explained to the jury that the x-ray of the exemplar cable was tight.  (Aplt. App. Vol. 3 at 579-581).  He also opined that the bus bar and cap nut connections on the exemplar truck appeared to be tight, consistent with Mr. Birmingham's testimony.    (Aplt. App. Vol. 3 at 448).    Thus, the only circumstantial evidence of Defendant's design revealed a tight connection at the bus bar and cap nut, not a loose one.  Therefore, there was insufficient evidence to support a determination that Plaintiffs demonstrated a defective design.

**2.      No Evidence of Defective Condition at the Time the Truck Left Defendant's Control.**

In addition to insufficient evidence of a defective design, there was also insufficient evidence that a defect was present in the truck at the time it left the manufacturer, as to both possible theories of defective design relating to (1) simply

11

the use of a cap nut and bus bar, and (2) the loose connection at the cap nut on the bus bar.

The defect or condition of the product about which Plaintiffs ultimately complained was the loose cap nut on the bus bar terminal. However, the jury heard no evidence that such a defect existed at the time the truck left Defendant's control. Mr. Martin was specifically questioned numerous times whether he could determine how long the cap nut had been loose on the incident truck. (Aplt. App. Vol. 4 at 620, 631). Mr. Martin's response was "[n]o. At this point, it's not possible. You can estimate it; but there's just too many variables." (Aplt. App. Vol. 4 at 643). Mr. Martin even opined that he doubted the nut was loose for the entire seven years the truck operated. (Aplt. App. Vol. 4 at 620). What the jury did hear from Mr. Martin was that he suspected that the incident truck did not leave the manufacturer in that loose condition because it would likely have resulted in corrosion of the battery cable. (Aplt. App. Vol. 4 at 631). In fact, it was Mr. Martin's expressed belief that the truck did not leave the manufacturer in that condition. (Aplt. App. Vol. 4 at 631) (testifying as follows: Q. And you don't know how long they were loose? A. No, I don't. Q. But you don't think it was that way originally? A. I don't believe it -- I just don't believe they would have been loose for seven years.").

Additionally, no condition of the nut was described by Mr. Martin that would lead to a tangential inference that the nut magically backed off the stud. Testimony that he "believed" that application to be improper does not establish defect, or that it was present at the time of manufacture, but encouraged the jury to make that illogical inference to Defendant's prejudice. Even the Trial Court noted that Plaintiffs lacked any evidence of a defect existing at the time of manufacture when it left Defendant's control. (Aplt. App. Vol. 4 at 681 ("THE COURT: You have no design drawings or anything from Freightliner indicating that in 1970 [sic] when the truck was manufactured that the design defect, which I assume is the cap nut on the cable, was the way that the truck was designed and manufactured at that time."). The Trial Court also noted "[t]here's no evidence of the condition of the truck at the time you purchased it." (Aplt. App. Vol. 4 at 683). Despite even the Trial Court's apparent understanding of the insufficiency of the evidence, it erred by allowing the jury to consider the same.

The evidence revealed that the truck contained only a chassis at the time it left Defendant's control, and that at the time of sale, the chassis was shortened by a third party, Midwest Truck Equipment, which also installed a hydraulic dump bed on the truck. (Aplt. App. Vol. 6 at 986-988). The shortened frame and dump bed no doubt required re-routing of the wiring to accommodate the new features. The

jury also heard evidence that up until 2004, the truck was repeatedly and regularly serviced and maintained at Kansas Truck Center, an independently owned and operated dealer.  (Aplt. App. Vol. 2 at 248; Aplt. App. Vol. 6 at 1011-1012).  After 2004, the truck underwent substantial repairs when Roberts Truck Center replaced the clutch in February of 2007.  (Aplt. App. Vol. 2 at 248).  Consequently, there was insufficient evidence that any defect was present at the time the truck left Defendant's control.

There are several Kansas cases instructive on the issue of whether the defect existed at the time the product left the manufacturer's control.  In *Farmers Ins. Company, Inc. v. Smith*, two insurers filed suit against a mobile home manufacturer for fire damage sustained to the mobile home and its contents.  219 Kan. 680, 680, 549 P.2d 1026, 1028 (1976).  The mobile home was purchased new and delivered to the owners on January 22, 1971 after being transported approximately 300 miles.  *Id.* at 681, 549 P.2d at 1028.  After delivery, the owners hired an electrician to hook up the power supply, and the owners finally moved into the home on January 29, 1971.  *Id.* at 681-82, 549 P.2d at 1028-29.  After occupying the home for approximately sixty-four days, the mobile home sustained fire damage on April 4, 1971, and the owners' insurers filed suit alleging a defect in the form of a loose electrical connection at the breaker box.  *Id.* at 682-83, 690, 549 P.2d at 1029-30,

1034.  In affirming the district court's directed verdict in favor of the defendants,

the Kansas Supreme Court addressed a situation similar to the facts here:

> There is nothing in evidence to show that the loose
> electrical connection which may have caused the fire
> existed at the time it left the possession or control of the
> defendants.  There is nothing in evidence to show that the
> loose electrical connection, whatever and wherever it
> might have been did not occur during the 64 days prior to
> the fire the Sweaney family occupied the mobile home as
> their residence.  The area of the mobile home where a
> defect could have existed was not a sealed unit
> inaccessible to persons using the mobile home after sale
> and delivery.  On the contrary the electrical wiring may
> well have been altered after the Sweaneys assumed full
> control of the mobile home.

*Id.* at 691, 549 P.2d at 1035.

In *Jacobson v. Ford Motor Co.*, 199 Kan. 64, 64, 427 P.2d 621, 622 (1967),

the plaintiff purchased a brand new car from a Ford dealer on August 7, 1959.  The

plaintiff sued Ford Motor Company for personal injury sustained in an accident on

March 3, 1961.  *Id.*  The Kansas Supreme Court affirmed the jury's verdict of no

defect, noting that "[t]he record does reveal the car was one year and seven months

old at the time of plaintiff's injury, it had been driven 31,000 miles, and about a

month prior to the crossing incident it had been involved in an accident in which it

pushed over a brick retaining wall."  *Id.* at 67, 427 P.2d at 624.  In contrast, the

Kansas Supreme Court in *Dieker v. Case Corp.*, 276 Kan. 141, 142, 162-63, 73

P.3d 133, 135, 146-47 (2003) found sufficient evidence of defect where the product was only 12 days old at the time of the fire, had only been operated for 120 hours, and no persons had conducted any repairs or maintenance to the area of the product in question.

The facts and analysis of a recent unreported case in the District of Kansas are also helpful to the Court's analysis here.  In *Dorn v BMW of North America, LLC.*, No. 09-1027-WEB, 2010 WL 3913226, at *1 (D. Kan. Sept. 30, 2010), the plaintiff filed suit against BMW for product liability defective design, seeking to recover damages from a fire in plaintiff's garage where the BMW was parked.  Plaintiff purchased the BMW on May 19, 2000, but the fire did not occur until approximately seven years later on March 27, 2007.  *Id.*  At the time of the fire, the BMW had 53,300 miles on the odometer.  *Id.*  Furthermore, from the date of its purchase up to the date of the fire, the BMW was repeatedly and consistently serviced and maintained by Joe Self BMW (approximately seventeen times), where the engine compartment was consistently accessed.  *Id.* at *1, *11.  The BMW was also involved in some type of accident approximately five years prior to the fire.  *Id.* at 11.  Relying on *Jacobson*, the *Dorn* Court reasoned as follows:

> This case is also similar to *Jacobson*, in that the car was out of the manufacturer's control for a long period of time.  The BMW had more miles than the car in *Jacobson*, and the BMW had also had the engine

> component of the vehicle accessed on numerous occasions. [].
>
> Although plaintiffs have shown the origin of the fire was in the BMW, they have failed to demonstrate a factual basis to support a reasonable inference that the cause of the fire existed when the BMW left the possession or control of the defendant seven years earlier. The plaintiff's claim for product liability therefore fails as a matter of law.

Id.

Like the vehicle in Dorn, the FL 70 in this case was out of the manufacturer's control for approximately seven years prior to the fire (In *Farmers* the mobile home had only been out of manufacturer's control for 120 days; in *Jacobson*, one year and seven months (*Farmers Ins. Co*., 219 Kan. at 691, 549 P.2d at 1035; *Jacobson,* 199 Kan. at 67, 427 P.2d at 624)).  Like *Dorn*, the vehicle in this case was repeatedly and consistently maintained and serviced by Kansas Truck Center until 2004, and then by Kechi Township's employees from 2004 to the time of the incident.  (Aplt. App. Vol. 2 at 248, 302).  Like the vehicle in *Dorn* with over 53,000 miles on it, the truck in this case had approximately 52,000 miles on it.  (Aplt. App. Vol. 3 at 529-530; Aplt. App. Vol. 5 at 895).  In addition, the truck here underwent major renovations when its chassis was shortened and a dump bed was installed.  It also had the clutch replaced in February of 2007. (Aplt. App. Vol. 2 at 248).  Days before the incident fire, Mr. McColm testified to

opening the hood and wiggling the battery cables.  (Aplt. App. Vol. 2 at 283).

Thus, there were numerous times where the engine compartment was accessed

after the truck left Defendant's control and, therefore, there were numerous

occasions when the cap nut could have been taken off and/or loosened without

being properly connected again.  Importantly, however, is the testimony of

Plaintiffs' own expert, Mr. Martin, which Plaintiffs simply cannot get around.  Mr.

Martin repeatedly testified that the loose cap nut did not exist at the time the truck

left Defendant's control.  (Aplt. App. Vol. 4 at 620, 631, 643).  Consequently,

Plaintiffs failed to show a defect at the time the truck left Defendant's control.

### 3.    No evidence that a defect caused Plaintiffs' damages.

Naturally, because there was insufficient evidence to show defect or that a

defect existed at the time of manufacture, there was insufficient evidence to show

causation.  Causation is irrelevant unless Plaintiffs can first establish a defect that

existed at the time of manufacture.  Further, there is no evidence that the mere

presence of a cap nut and bus bar caused the incident.  Rather, Plaintiffs complain

of the loose connection at the bus bar.  As to this issue, however, Mr. Martin

opined that the loose connection contributed to the fire, but that the fire was

ultimately caused by a fault or short, and not the loose connection.  (Aplt. App.

Vol. 4 at 620).  Therefore, Plaintiffs failed to established causation.

**4.    The Trial Court erred by allowing improper stacking of inferences through circumstantial evidence to be submitted to the jury.**

As to the existence of the bus bar and cap nut at the time it left Defendant's control, Plaintiffs presented insufficient circumstantial evidence supporting the same.  It is clear that the entirety of Plaintiffs' case was based on circumstantial evidence, including circumstantial evidence of Defendant's design.  Circumstantial evidence in civil cases results in inferences, and Defendant does not dispute that circumstantial evidence can lead to proper inferences.  *Pekarek v. Sunbeam Products, Inc.*, 672 F. Supp. 2d 1161, 1190 (D. Kan. 2008) (analyzing *Mays*, 233 Kan. at 54, 661 P.2d at 360).  Rather, what Defendant disputes is the number of inferences in evidence, and the improper stacking of possible inference upon possible inference.  The law in Kansas is clear: piling impermissible inference upon inference is improper.  *State v. Rice*, 261 Kan. 567, 587, 932 P.2d 981, 996 (1997) (stating the case did not involve an "impermissible stacking of inferences"); *McKenzie v. New York Life Ins. Co.*, 153 Kan. 439, 112 P.2d 86, 90 (1941) ("[t]his would be piling presumption and inference upon presumption and inference.  It is elementary that that may not be done and that a burden of proof may not be met by mere conjecture."); (citing *Emigh v. Andrews*, 164 Kan. 732, 191 P.2d 901 (1948)); *NLRB v. Meinholdt Mfg. Inc.*, 451 F.2d 737, 738 (10th Cir. 1971) ("[b]*ut an*

*inference cannot be piled upon an inference, and then another inference upon that, as such inferences are unreasonable and cannot be considered as substantial evidence.*") (quoting *Interlake Iron Corp. v. NLRB*, 131 F.2d 129, 133 (7th Cir. 1942)) (emphasis supplied in *Meinholdt*).    Furthermore, "[f]or circumstantial evidence to make out a prima facie case, it must tend to negate other reasonable causes, or there must be an expert opinion that the product was defective." *Mays*, 233 Kan. at 54; 661 P.2d at 360.    It is also true that "[b]ecause liability in a products liability action cannot be based on mere speculation, guess or conjecture, the circumstances shown must justify an inference of probability as distinguished from mere possibility." *Id.*, 661 P.2d at 360.

There were at least three layers of inferences before the jury.    The first layer starts with the exemplar truck and Plaintiffs' inference that the design of the exemplar truck included a bus bar and cap nut.    This is an inference because Plaintiffs had no knowledge or direct evidence of this vehicle's repair history; its identity by VIN number; the routing of wiring and the battery cable; its maintenance history; its modification history; the type and size of its engine; and whether its battery cable and cap nut were present on the truck at the time it left Defendant's control.    (Aplt. App. Vol. 3 at 396-397).    This exemplar was a 2000

FL-70 truck observed in 2008 with unknown repairs and contact by unknown third parties.  (Aplt. App. Vol. 3 at 393, 396-397, 398).

The second layer of inference is Plaintiffs' inference of what Defendant's design of the exemplar truck was.  The third layer of inference is Plaintiffs' request that the jury infer that a bus bar and cap nut was present at the time the truck left Defendant's control, which in turn is based on the inference of Defendant's design of the incident truck, which in turn is based on the inference of the design of the exemplar truck.  At each step in the inference chain, Plaintiffs failed to raise the inference beyond mere possibility.  For example, there was no evidence eliminating the possibility that the bus bar and cap nut in the exemplar truck were not installed during a repair or maintenance after the truck left Defendant's control.  There was insufficient evidence eliminating the possibility that the complained of cap nut and bus bar on the incident truck were not altered or loosened after they left Defendant's control over seven years prior to the fire.  Defendant submits that this is insufficient evidence, as it stacks impermissible inference upon inference.

The Trial Court expressed much concern over Plaintiffs' entire case being supported by circumstantial evidence.  Addressing the insufficient evidence of any defect at the time the truck left Defendant's control, the Trial Court expressed to Plaintiffs' counsel "there's no direct evidence of that.  So you're going to rely

totally on circumstantial evidence." (Aplt. App. Vol. 4 at 681). Addressing the insufficient evidence of any design defect, the Trial Court noted "[m]y point is here that there is no direct evidence of the design of this vehicle in 1970 [sic]. So the entire claim, whatever your design defect or defects are, is based on circumstantial evidence." (Aplt. App. Vol. 4 at 682). As to the entirety of Plaintiffs' evidence, the Trial Court noted "[s]o it's all circumstantial." (Aplt. App. Vol. 4 at 683). Despite its expressed concern, the Trial Court erred by denying Defendant's pretrial and post-trial motions and allowing the jury to consider Plaintiffs' impermissibly stacked inferences based upon circumstantial evidence.

Furthermore, Plaintiffs failed to sufficiently eliminate other reasonable causes of the fire. Under Kansas law, "circumstantial evidence must eliminate other reasonable causes, or there must be expert testimony as to the existence of an actual defect in the product." *Mays*, 233 Kan. at 54; 661 P.2d at 360. Plaintiffs failed to sufficiently eliminate the wood burning stove, ashes and coals placed into the plastic trash bin, and the Gator as reasonable causes. In addition to failing to rule out other causes, Plaintiffs also failed to present any expert testimony that there was a defect in the truck or any of its components. As set out above, Mr. Martin identified an event, a mere occasion. He gave an opinion on what the cause

of the fire was.  However, at no time during his testimony to the jury did he opine on the alleged existence of a defect in the truck or in its components.  He never opined that the cap nut, the bus bar, or Defendant's design was in any way defective.  It is improper to infer defect from the mere identification of an event. *McCroy v. Coastal Mart, Inc.*, 207 F. Supp. 2d 1265, 1272 (D. Kan. 2002) ("[t]he court declines to follow plaintiffs' *post hoc, ergo propter hoc* rationale.  Under Kansas law, such proof is inadequate to establish a viable products liability claim." (citing *Jenkins*, 256 Kan. at 635, 886 P.2d at 889 ("[i]nferring a defect from the fact of the injury … is unsuitable")).

There was no direct evidence of Defendant's design.  Plaintiffs did not seek even the most basic of fact discovery pertaining to this issue.  They never requested design documents, and they never deposed a single witness from Defendant.  Instead of seeking direct evidence, they attempted to prove their entire case by circumstantial evidence based on exemplars they knew nothing about. Plaintiffs failed to present inferences of probability.  *Mays*, 233 Kan. at 54, 661 P.2d at 360 ("the circumstances shown must justify an inference of probability as distinguished from mere possibility").  Plaintiffs' evidence failed to extend outside the realm of possibility, and the Trial Court erred by submitting it to the jury.

**B.    The Trial Court Improperly Allowed Mr. Martin's and Mr. Birmingham's Testimony to Be Considered by the Jury.**

**Standard of Review**:  *Daubert* held that trial courts have an obligation as "gatekeepers" to insure that proffered expert testimony is relevant and sufficiently reliable to be of assistance the jury.  This Court reviews *de novo* whether the trial court properly performed its role as "gatekeeper," and reviews for an abuse of discretion the manner in which the role is performed.  *United States v. Allen,* 603 F.3d 1202, 1212 (10th Cir. 2010).

*   *   *

Plaintiffs' experts failed to satisfy the requirements of *Daubert* and should have been excluded from testifying at trial.  Federal Rule of Evidence 702 ("Rule 702") establishes the general standard for admissibility of expert testimony, stating:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise, if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  "The Supreme Court has laid out a framework for analyzing proffered expert testimony in the so-called *Daubert* trilogy, which consists of

*Daubert*,[1] *GE Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)." *Truck Ins. Exchange v. Magnetek, Inc.*, 360 F.3d 1206, 1209 (10th Cir. 2004). In *Daubert*, the United States Supreme Court held that Rule 702 requires trial courts to act as gatekeepers and exclude expert witness testimony that is not both relevant and reliable. *Daubert,* 509 U.S. at 589.

To assess reliability, the Court may consider the following factors: (1) whether the opinions at issue can be tested, and if so, whether they have been tested; (2) whether the opinions have been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used; and (4) whether the opinions find support in the scientific community. *Daubert*, 509 U.S. at 593-94. This list, however, is not exclusive, and the Court has "broad discretion to consider a variety of other factors." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003). "The touchstone of Rule 702 is helpfulness of the expert testimony, a condition that goes primarily to relevance." *Mehus v. Emporia State Univ.*, 222 F.R.D. 455, 458 (D. Kan. 2004).

---

[1] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

On January 4, 2012, the Trial Court conducted a hearing on Defendant's *Daubert* motions directed towards both Mr. Martin and Mr. Birmingham. (Aplt. App. Vol. 7 at 1139-1265). The Trial Court properly excluded Mr. Birmingham in part; however, the Trial Court erred when it failed to disallow the testimony of Mr. Martin and Mr. Birmingham at trial. (Aplt. App. Vol. 7 at 1198-1199; Aplt. App. Vol. 1 at 39-40; Aplt. App. Vol. 1 at 41-45).

**1.     The Trial Court erred in allowing Mr. Martin to testify.**

**a.     Mr. Martin lacked knowledge of Defendant's design.**

The Trial Court committed error when it allowed Mr. Martin to offer opinions of design defect. At the close of discovery, at the *Daubert* hearings, and at trial, it was clear that Mr. Martin knew nothing of Defendant's design of the incident truck. Mr. Martin did not consult, review, or analyze a single design drawing relating to the incident truck. (Aplt. App. Vol. 7 at 1246, 1252). Simply stated, Mr. Martin possessed no knowledge of Defendant's design process for the truck, and he should not have been allowed to offer any opinions relating to the same. Moreover, and importantly, Mr. Martin should not have been allowed to opine that the ignition theory he identified, *i.e.*, the loose connection near the starter that created resistance heating, was in any way attributable to an alleged design defect.

Mr. Martin's lack of knowledge relating to design should have prevented him from speculating on what he believed the design of the incident truck was, based on his review of the photographs of the "exemplar" truck taken by Mr. Birmingham. Mr. Martin did not personally inspect this exemplar truck. (Aplt. App. Vol. 7 at 1214-1215, 1234, 1257-1258). This exemplar truck was of unknown origin, unknown use, and unknown repair history. Apart from this, Mr. Martin knew little to nothing about this truck. Therefore, the Trial Court committed error in allowing him to testify as to design defect.

Similarly, Mr. Martin should not have been permitted to opine that the new exemplar battery cable with its associated cap nut was the same that Defendant designs and manufactures or that it was identical to any alleged cable and cap nut asserted to be present in the truck at the time it left Defendant's control. The exemplar cable was purchased by Mr. Birmingham at Kansas Truck Center, and not directly from Defendant. (Aplt. App. Vol. 3 at 403). The exemplar cable was an after-market product, and Mr. Martin had no direct evidence that the same was the design specification of Defendant or that such a cable was present in the truck at the time it left Defendant's control. The exemplar cable could have been manufactured by a third party unrelated to this litigation. When questioned about this exemplar cable, it became evident that Mr. Birmingham did not verify the

exemplar cable was original equipment manufactured in the incident truck. (Aplt. App. Vol. 7 at 1170-1176). He admitted he did not know whether the exemplar was an original part. (Aplt. App. Vol. 7 at 1172). Working off Mr. Birmingham's work, Mr. Martin then inappropriately, and without any basis, assumed that Defendant supplied the cable found in the fire debris from the incident truck simply because it was found in the fire debris. However, Mr. Martin also admitted he did nothing to verify the exemplar cable was original equipment. (Aplt. App. Vol. 7 at 1237-1238). Thus, he had no admissible facts supporting his conclusion, as he had never tied what was found at the scene of the fire with what Defendant actually specified in its design and manufacture for the incident truck. Plaintiffs thus failed to offer expert opinion or admissible evidence of design defect; consequently, the Trial Court erred in submitting Plaintiffs' case to the jury.

Such opinions and testimony by Mr. Martin relating to the exemplar truck and exemplar cable amounted to nothing more than speculation upon speculation, which is not helpful to the jury and should have been excluded. "It is axiomatic that an expert, no matter how good his credentials, is not permitted to speculate." *Goebel v. Denver & Rio Grande Western R.R. Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000); *see also Acker v. Burlington N. & Santa Fe R.R. Co.*, 347 F. Supp. 2d 1025,

1031 (D. Kan. 2004) (finding that plaintiff's damages expert's testimony was too speculative, and, thus, inadmissible).

### b.   Mr. Martin failed to follow standard fire investigation procedures.

The Trial Court also erred by allowing Mr. Martin to testify because he failed to follow standard fire investigation procedures outlined in National Fire Prevention Associate ("NFPA") 921.  In the context of fire investigation, NFPA 921 has been recognized as a reliable standard.  *See Hoang v. Funai Corp., Inc.*, 652 F. Supp. 2d 564, 567 (M.D. Pa. 2009) ("[s]everal courts, including this one, have recognized that NFPA 921 offers a comprehensive and detailed treatment for fire investigation and have held its methodology is reliable for purposes of Rule 702." (citing *Booth v. Black & Decker, Inc.*, 166 F. Supp. 2d 215, 220 (E.D. Pa. 2001); *United States v. Zhou*, No. 06-cr-286, 2008 WL 4067103, *5 (D.N.J. 2008) (citing *Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.*, 394 F.3d 1054, 1057-58 (8th Cir. 2005)).

NFPA 921 governs the systematic approach to determining fire causation by "Process of Elimination."  As he testified, Mr. Martin clearly did not concern himself with ruling out other potential causes by process of elimination mandated by NFPA 921 because he simply did not rely upon it in forming his opinions. Rather, Mr. Martin was content to rest fully on the assumptions of Mr.

Birmingham as to fire origin, and subsequently concerned himself and his opinions with only the incident truck. (Aplt. App. Vol. 7 at 1206-1208). Notably, Mr. Martin also failed to follow NFPA 921's process of elimination requirement in Section 18.2.1 because, as he admitted, he never followed NFPA 921; rather, he relied solely upon Mr. Birmingham. (Aplt. App. Vol. 7 at 1206-1208). Therefore, it is apparent that Mr. Martin never adhered to NFPA 921's requirement to eliminate other potential causes. Accordingly, Mr. Martin's opinions lacked the requisite methodology and should have been excluded.

The Trial Court should have also excluded Mr. Martin's speculation that the cables surrounding the starter and solenoid contained some type of insulation capable of spreading the fire. Mr. Martin further opined that the initial ignition source was the insulation covering the electrical cables near the starter motor and control solenoid. (Aplt. App. Vol. 7 at 1242-1245). However, Mr. Martin admitted that he was only _assuming_ that the cables were insulated by some type of PVC capable of fire spread. (Aplt. App. Vol. 7 at 1242-1245). It is clear from this testimony that Mr. Martin possessed no knowledge of the characteristics of the wiring insulation he claimed was the initial ignition source.

Mr. Martin failed to satisfy his burden as an expert to use reliable methodology in reaching his conclusions. Mr. Martin did not examine a single

specification from Defendant relating to the characteristics of the wiring insulation. He also had no knowledge of whether the wiring was the original wiring or replacement/repair wiring installed during one of the truck's numerous repairs and modifications subsequent to manufacture. Instead, Mr. Martin simply assumed that the relevant wiring was coated with the type of insulation that would allow the fire to spread according to his scenario. These assumptions should have been excluded.

### 2.     The Trial Court erred in allowing Mr. Birmingham to testify.

Mr. Birmingham's origin opinions failed to fit the facts of this case. On the day prior to the fire, before leaving work for the day at approximately 3:15 p.m., Kechi Township's employee at the time, Jacob Cox, removed hot ashes from a wood burning stove. (Aplt. App. Vol. 6 at 1036-1038). During his investigation into the cause of the fire, Captain Leake, the cause and origin investigator with the Sedgwick County Fire Department, examined the remains of the building the morning after the fire. (Aplt. App. Vol. 6 at 1019-1021). As part of his investigation, Captain Leake interviewed two of Plaintiffs' employees who were present at the site, Curtis McColm and Jacob Cox. (Aplt. App. Vol. 6 at 1034-1036).

According to Mr. McColm, he told Captain Leake during the interview that he observed Mr. Cox removing hot ashes into a plastic trash container. (Aplt. App. Vol. 6 at 1036-1038). This plastic container was also located inside the shop building in close proximity to the wood burning stove and the incident truck. (Aplt. App. Vol. 6 at 1042). Captain Leake also interviewed Mr. Cox, who admitted that indeed he had disposed of hot ashes into the plastic container right before leaving the shop building for the day. (Aplt. App. Vol. 6 at 1037-1038). Mr. Cox further reported that after he removed the ashes, he placed additional logs into the stove and started the fire before he left. (Aplt. App. Vol. 6 at 1037-1038). Mr. McColm also stated that it was not uncommon for the wood burner to be burning all night and throughout the day. (Aplt. App. Vol. 6 at 1037). Thus, the stove was to operate unattended for the remainder of the day and through the night, without any employees present at the shop building.

Although Captain Leake concluded that the fire cause was of "'undetermined,'" he also expressly concludes that fire originated at the area of the wood burning stove. (Aplt. App. Vol. 6 at 1045-1046). The fact that Mr. Cox disposed of hot ashes into the plastic trash container was an important fact for Captain Leake in reaching his opinions." (Aplt. App. Vol. 6 at 1038).

Despite this evidence, Mr. Birmingham opined that the fire originated at the truck. (Aplt. App. Vol. 7 at 1142). Instead of addressing the numerous burn patterns throughout the building, Mr. Birmingham focused on one burn pattern located underneath the incident truck. (Aplt. App. Vol. 7 at 1146). Yet, Mr. Birmingham failed to describe how it is that this one, single burn pattern takes precedence over all others. Mr. Birmingham did not sufficiently eliminate the wood burning stove and disposal of hot ashes into a plastic container as an alternative, reasonable cause of the fire, and his failure to do so revealed his bias in finding facts to fit and support his own theory, or perhaps the theory of Mr. Martin.

In contrast to Captain Leake's interview of multiple witnesses, Mr. Birmingham conducted no official interviews, only spoke with Jim Day, and did not speak with Mr. McColm or Mr. Cox. (Aplt. App. Vol. 3 at 341). Mr. Birmingham's failure to conduct basic witness interviews revealed his bias in reaching his opinions in this case and failed the reliability prong of *Daubert*. If Mr. Birmingham would have interviewed necessary witnesses, *i.e.*, Curtis McColm and Jacob Cox, perhaps he would have sufficiently understood the other possible and probable origins of the fire. He apparently did not even consider the trash dumpster and wood burning stove to be relevant. Mr. Birmingham's testimony and opinions revealed his bias and improper methodology, which circumvent the

reliability and relevancy requirements of *Daubert* and Rule 702 and should have been excluded by the Trial Court.

NFPA 921 governs "Origin Determination," and Mr. Birmingham's failure to eliminate or even address other fire patterns and investigate necessary witnesses is a violation of the express terms of NFPA 921.  Mr. Birmingham failed to adhere to this standard, and his opinions should have been excluded by the Trial Court.

**C.    The Trial Court Improperly Allowed Mr. Day to Testify Pursuant to Fed. R. Evid. 701 as the Alleged "Owner" of the Damaged Property.**

James Day is an employee of Kechi Township, and has been employed by Kechi Township for approximately thirty-four years, at least as of the time of trial. (Aplt. App. Vol. 2 at 240).  Mr. Day does not have an official title; however, he supervises the road maintenance and is caretaker for the township cemetery.  (Aplt. App. Vol. 2 at 240).    As employee, Mr. Day reports to the Board of Commissioners of Kechi Township.  (Aplt. App. Vol. 2 at 241).  Mr. Day works with only one other full time employee, Curtis McColm.  (Aplt. App. Vol. 2 at 241 (the transcript refers to a "Kirk McCall;" however, this is likely a typographical error in referring to Curtis McColm).  Mr. Day's general work duties include "maintenance of roads, road surfaces, maintaining ditches, signs, obstructions in the road.  Cemetery work would be sales, arranging funerals, whatever comes up,

filling of graves, mowing and supervising the upkeep of the cemetery." (Aplt. App. Vol. 2 at 240-241).

On the first day of trial, Plaintiffs called Mr. Day as their first witness and attempted to admit into evidence a host of information regarding replacement costs for various pieces of heavy machinery damaged in the fire. (*See generally* Aplt. App. Vol. 2 at 239-267). Defendant objected to such testimony on the basis of foundation and relevance, and Mr. Day's testimony was suspended to provide Plaintiffs the opportunity to improve Mr. Day's foundation to offer property valuation testimony. (Aplt. App. Vol. 2 at 267-279). After excusing the jury upon Defendant's initial objection, the Trial Court admonished Plaintiffs' counsel that the proper measure of damages is the fair market value immediately before and immediately after the fire. (Aplt. App. Vol. 2 at 270-274). The Trial Court then allowed Plaintiffs an additional opportunity to restore Mr. Day's testimony and provide foundation for why he should be able to opine on fair market value of the destroyed property in accordance with Kansas law. (Aplt. App. Vol. 2 at 261-266).

Mr. Day was called back to the witness stand later on in the first day of trial. (Aplt. App. Vol. 2 at 305). During this testimony, Mr. Day admitted that he had never evaluated the fair market value of the heavy equipment and what it was worth the day prior to the fire. (Aplt. App. Vol. 2 at 306). He acknowledged that

he had never worked as a real estate appraiser or had any training in this area. (Aplt. App. Vol. 2 at 307).  He testified that he has never worked for a heavy equipment dealer, such as John Deere or Foley Equipment.  (Aplt. App. Vol. 2 at 307).  Mr. Day admitted he has never worked in sales for any heavy equipment dealer.  (Aplt. App. Vol. 2 at 307).  He also expressly admitted to having no training to appraise heavy equipment and possessed no certificates of appraisal training.  (Aplt. App. Vol. 2 at 307-308).

Mr. Day acknowledged that he had never testified as an appraiser before, either as to the value of heavy equipment or real property.  (Aplt. App. Vol. 2 at 308).  When questioned by his own counsel what he did to value the equipment lost in the fire, Mr. Day testified "[m]ainly what I went by was like replacement cost where we could.  [].  Just based on what I thought the equipment was worth." (Aplt. App. Vol. 2 at 310).  On recross examination, Mr. Day admitted that all evidence he presented to the jury was based on replacement cost.  (Aplt. App. Vol. 2 at 317-318).  He acknowledged before the Trial Court that he had done nothing to research fair market value of the property damages, but instead went by replacement cost.  (Aplt. App. Vol. 2 at 318-319).

After hearing this testimony, the Trial Court ruled as follows:

> Well, Mr. Day is not qualified to testify about the real estate.  That's clear.  He admits that.  With respect to the

property, the heavy equipment, the only one that I think that a replacement value would be consistent with the value before the fire, immediately before the fire, is the Gator. It sounds like the Gator was brand new. But the others, I'm just not satisfied. I hear what he says about how he keeps up on things; but that's not the issue here. The issue is the date of the fire, not just generally what things are worth. And I haven't heard evidence sufficient to convince me that he has looked into and has developed an opinion with respect to what these various items, the loader, the Chevy dump truck, the Freightliner, the grader, the mowers and the John Deere tractor, were worth right after the fire. Now, I'm not going to say at this point in time that he can't testify about this. I'll give the Plaintiff an opportunity to see if they can improve his testimony in this regard. But if they can't, I'm not going to let him testify about it. Just general keeping up on the value of things is not sufficient to satisfy the Plaintiff's burden of proof here under the instructions. I don't know how the jury would really be able, after hearing his testimony today, to arrive at even a reasonable figure, a reasonable estimated figure, on anything except the Gator. What's new is the same as what you replace it with. That's the ruling. I don't know how you all are going to work it out; but – it's close to speculation on the rest of 'em and I'm not going to allow him to speculate. So, no real estate and -- not from this witness, in any event. This witness can testify about the Gator. The rest of 'em, not at this point in time. And he'll have to go through this process again, if Mr. Lang wants him to, with respect to specific figures as to the date of the fire.

(Aplt. App. Vol. 2 at 319-320).

Subsequent to this ruling, Plaintiffs filed their Motion for Reconsideration of

the Court's ruling in this respect, and for the very first time raised the argument of

the Kansas owner rule. (Aplt. App. Vol. 1 at 54-61). Plaintiffs acknowledged in their motion that "[a]t the time of the Court's ruling and the objections lodged by the defendant, plaintiffs were unable to substantively respond to the arguments presented." (Aplt. App. Vol. 1 at 56). Defendant filed its Response, arguing Plaintiffs' Motion as improper under the standard for motions to reconsider, and also asserting that Plaintiffs should not be given multiple opportunities to present arguments not previously presented and challenge orders previously made. (Aplt. App. Vol. 1 at 62-68). The next morning at trial, the Trial Court acknowledged that he had not yet read the brief, but instead directed the parties to file briefing on this damages issue to be considered when trial commenced the following week, after the weekend. (Aplt. App. Vol. 4 at 605; 684-701).

The parties submitted their briefing, and the Trail Court held, albeit improperly for the aforementioned reasons, that Mr. Day could testify on damages to the personal property and heavy equipment as owner of the property. (Aplt. App. Vol. 1 at 92-95). The Trial Court properly held that Mr. Day could not testify as to the real estate because he was not offering any evidence of fair market value immediately before and after the fire, and that his testimony would be hearsay. (Aplt. App. Vol. 1 at 92-93). Thus, on the final day of trial, Mr. Day was put back on the stand, for the third time, and permitted, as the alleged "owner" of the

property, to offer testimony relating to the heavy equipment and personal property that was damaged in the fire.

The Trial Court provided Plaintiffs multiple opportunities to present evidence of fair market value as required by Kansas law.  It allowed Plaintiffs three opportunities to put Mr. Day on the stand.  Despite these multiple opportunities, Plaintiffs failed to present evidence of fair market value immediately before and after the incident fire.

**1.    Mr. Day was not an "owner" of Kechi Township's property pursuant to K.S.A. § 80-101 et seq., but the Trial Court improperly allowed Mr. Day to testify as owner.**

Kansas Statutes Annotated § 80-101 et seq. sets for the powers of a Township in Kansas, how they are regulated, and identifies those persons with authority to act on behalf of the townships, such as clerks, trustees, and board members.  Mr. Day, however, is none of these.  Rather, he is an employee, the shop maintenance supervisor.  Mr. Day is thus not the "owner" of Kechi Township's property, either under the statutory scheme in Section 80-101 et seq. or within the framework of the owner rule allowing owners to testify as to the value of their property.  Each case cited by Plaintiffs addressing the owner rule is within the context of someone's personal property, or the owner of a corporation that has

lost its property.  There is no case law supporting the extension of the owner rule to mere employees of a Township.

Defendant objected on the statutory basis when Mr. Day took the stand again in the context of "owner."  During its objection, Defendant requested that the Trial Court take judicial notice of the powers and authorities granted those in K.S.A. §80-101 et seq., but the Trial Court overruled Defendant's objections and allowed Mr. Day to testify as owner.  (Aplt. App. Vol. 5 at 702-703).  This was error by the Trial Court.  Mr. Day is not an owner of the property under the express laws of Kansas, and his testimony should have been excluded.

### 2.      Federal Rules of Evidence Govern the Admissibility of Mr. Day's Testimony and Prohibit Rule 702 Expert Testimony Disguised as Rule 701 Lay Testimony.

The Trial Court should have also excluded Mr. Day's testimony as "owner" of the property because it was improper expert testimony under Rule 702 presented in the form of lay testimony under Rule 701.  In the recent case of *James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207 (10th Cir. 2011), the Tenth Circuit Court of Appeals addressed a factual and legal scenario almost identical to the case at hand.  In *James River*, a dilapidated building owned by Rapid Funding burned down, and the insurance company, James River, refused to pay the claim on the basis that the building possessed no market value prior to destruction.  *James*

*River*, 658 F.3d at 1210.  The case was brought in Colorado federal court on diversity grounds, and the district court ultimately rendered a verdict in favor of Rapid Funding.  *Id.* at 1212.  The district court specifically ruled that Mr. Miller, the owner of the Rapid Funding business, the business which in turn owned the burned down property, could testify to property valuation as a lay witness under Rule 701, but not as an expert under Rule 702.  *Id.* at 1211.  James River appealed, challenging the admissibility of such property valuation testimony provided by Mr. Miller, arguing that the testimony was inadmissible expert testimony under Fed. R. Evid. 702.  *Id.* at 1213.

On appeal, Rapid Funding argued that Mr. Miller's property valuation testimony was based on Colorado's state law allowing a landowner to testify to the value of his or her property, and as such, it was admissible lay opinion testimony. *Id.* at 1213.  In response, James River argued that Mr. Miller's property valuation testimony was expert testimony in nature, and thus it should not have been admitted under Rule 701's standards for lay witnesses.

The Tenth Circuit began its analysis by first addressing weather Mr. Miller's testimony was admissible as lay witness testimony under Rule 701.  *Id.*  In sum, the Tenth Circuit found that "Mr. Miller's valuation testimony was expert opinion testimony based on technical or specialized knowledge and therefore inadmissible

under Rule 701(c)." *Id.* at 1214. The Court noted that "Rule 701 'does not permit a lay witness to express an opinion as to matters which are beyond the realms of common experience and which require the special skill and knowledge of an expert witness.'" *Id.* (quoting *Randolph v. Collectramatic, Inc.*, 590 F.2d 844, 846 (10th Cir. 1979)). The court recognized James River's reliance upon Rule 702's advisory committee notes, which state that "'within the scope of the rule are … the large group sometimes called "skilled" witnesses, such as bankers or landowners testifying to land values.'" *Id.* at 1213.

The Tenth Circuit listed four reasons why Mr. Miller's testimony was expert in nature and thus inadmissible under Rule 701. *Id.* at 1214. First, the court simply recognized that the nature of Mr. Miller' testimony was not lay witness testimony. *Id.* In support of its reasoning, the court quoted with seeming approval a case from the Third Circuit Court of Appeals:

> The prototypical example of the type of evidence contemplated by the adoption of Rule 701 relates to the appearance of persons or things, identity, the manner of conduct, competency of a person, degrees of light or darkness, sound, size, weight, distance, and an endless number of items that cannot be described factually in words apart from inferences.

*Id.* (quoting *Asplundh Mfg. Div. v. Benton Harbor Eng.*, 57 F.3d 1190, 1196 (3d Cir. 1995)). The Tenth Circuit likened lay witness testimony to simple

mathematical equations capable of being reached by any person possessing a grade school education. *Id.* As to the exercise of depreciation, the Tenth Circuit found that "calculating depreciation requires more than applying basic mathematics. Technical judgment is required in choosing among different types of depreciations." *Id.* (citations omitted) (emphasis added). In sum, the court found Mr. Miller's valuation testimony beyond the scope of Rule 701 testimony. *Id.*

Second, the Tenth Circuit stated that "Mr. Miller's calculations were based in part on his professional experience in real estate," and "[k]nowledge derived from previous professional experience falls squarely within the scope of Rule 702 and thus by definition outside of Rule 701." *Id.* at 1215 (citing *United States v. Smith*, 640 F.3d 358, 365 (D. C. Cir. 2011)).

Third, the Tenth Circuit addressed the fact that Mr. Miller relied upon "a technical report by an outside expert," which contained "specialized accounting calculations." *Id.* at 1215. Apparently Rapid Funding had hired an outside expert, Anderson Group, to provide a property valuation report for the destroyed building. *Id.* Mr. Miller then relied upon that report in providing his "lay" witness opinions, and the Tenth Circuit noted this was improper under Rule 701 because "[s]uch testimony should only be admitted under Rule 702, not Rule 701." *Id.*

Fourth, the court stated "the Federal Rules of Evidence generally consider landowner testimony about land value to be expert opinion.  Rule 702 advisory committee's notes states that landowners testifying to land value are 'skilled witnesses' under Rule 702.'"  *Id.* (quoting Fed. R. Evid. 702, advisory committee's notes).  Accordingly, the Tenth Circuit held that Mr. Miller's testimony was expert testimony, and stated that "[t]he district court allowed Rapid Funding to do exactly what Rule 701(c) prevents: circumvent Rule 702 by offering expert testimony as lay opinion."  *Id*. at 1216.  The Tenth Circuit then relied upon and quoted the advisory committee note to Rule 701, the 2000 amendment:

> Rule 701 has been amended to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing.  Under the amendment, a witness' testimony must be scrutinized under the rules regulating expert opinion to the extent that the witness is providing testimony based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

*Id.*  Ultimately, the Tenth Circuit found Mr. Miller's property valuation testimony inadmissible and "excluded from the category of lay opinion under Rule 701(c)."  *Id*.

In identical fashion, the Trial Court should have found Mr. Day's property valuation testimony excluded from lay witness testimony under Rule 701 and thus

inadmissible.  All four factors set forth by the Tenth Circuit in *James River* are likewise applicable here.  First, Mr. Day was offered by Plaintiffs to testify on depreciation values of both real and personal property.  "[C]alculating depreciation requires more than applying basic mathematics.  Technical judgment is required in choosing among different types of depreciation."  *Id.* at 1214.  Thus, Mr. Day's testimony is expert under Rule 702, and not lay under Rule 701.

Second, Mr. Day testimony was based on the following:

> Mr. Day's proffered testimony was based on (1) his 30+ years in the business of buying, selling and trading in heavy equipment; (2) his discussions with dealers in requesting heavy equipment that is similar to the equipment destroyed in the fire; (3) his personal research and knowledge of the equipment; (4) actual offers to purchase some of the equipment prior to the fire and (5) evaluation of the replacement cost of the building.

(Aplt. App. Vol. 1 at 58).  As stated above, "[k]nowledge derived from previous professional experience falls squarely within the scope of Rule 702 and thus by definition outside of Rule 701."  *James River*, 658 F.3d at 1215 (citing *United States v. Smith*, 640 F.3d 358, 365 (D.C. Cir. 2011)).  Even the Trial Court acknowledged in its order that "Day's testimony may be somewhat specialized due to the fact that an average juror probably is not familiar with the value of heavy equipment."  (Aplt. App. Vol. 1 at 94).  Despite this acknowledgement, the Trial Court erred in allowing such specialized testimony.

Thirdly, included in Plaintiffs' exhibit book was an appraisal estimation of the replacement cost of the actual building itself.  (Aplt. App. Vol. 1 at 93).  This appraisal by some outside source is markedly similar to the "technical report" relied upon by the Mr. Miller in *James River*.  For Mr. Day to obtain a market value of the building prior to destruction, he *must* utilize a depreciation calculation, which again is a precisely enumerated reason to treat his testimony as expert testimony under Fed. R. Evid. 702.  Therefore, his "lay opinion" testimony on the value of the real property, based on his reliance on the property appraisal document, was inadmissible.  While the Trial Court correct excluded Mr. Day's testimony on real estate because it was inadmissible hearsay, it should have also been excluded for this independent basis.  (Aplt. App. Vol. 1 at 92-93).

Fourth, it is clear that the Federal Rules of Evidence view testimony of property valuation as expert testimony.  *James River*, 658 F.3d at 1215.  It is improper for Plaintiffs to cloak matters appropriate for expert testimony in proffered lay witness opinion. Accordingly, under the Federal Rules of Evidence, Mr. Day's property valuation testimony should have been completely excluded by the Trial Court.

3. **The Trial Court improperly relied upon the Kansas common law rule allowing property owners to testify as to the value of their property, as *James River* addressed and prohibited this exact type of testimony.**

The Trial Court erred in admitting Mr. Day's property valuation testimony by likening him to an owner of Kechi Township's property, and thus relying on the Kansas common law rule allowing property owners to testify on the value of their property. This type of testimony was also squarely addressed and rejected by the Tenth Circuit in *James River*. This case sits in federal court on diversity grounds. As such, the case is governed by Kansas substantive law and Federal procedural law as prescribed by *Erie R.R. v. Tompkins*, 304 U.S. 64, 78, (1938); *see also James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1217 (10th Cir. 2011) (citing *Hanna v. Plumer*, 380 U.S. 460, 465 (1965)).

Specifically, as it relates to application of Fed. R. Evid. 701, the Tenth Circuit stated that "[t]he different methods of adoption [of the rules] affect our choice-of-law analysis in the Tenth Circuit." *James River*, 658 F.3d at 1218. The Tenth Circuit noted that section (c) of Fed. R. Evid. 701 was "adopted under the Rules Enabling Act," and then explained that "*Shady Grove* – the most recent Supreme Court case interpreting how to apply rules adopted under the Rules Enabling Act in a diversity case – governs the application of Rule 701(c) here." *Id.* According to the Tenth Circuit, *Shady Grove* provides a two-step process in

determining which law applies: "the first step is to determine whether the federal rule and state law conflict." *Id.* The second step states "if applying the federal rule and state law results in a 'direct collision, the court must decide whether application of the federal rule represents a valid exercise of the rulemaking authority … [under] the Rules Enabling Act.' []. 'That Act requires, inter alia, that federal rules "not abridge, enlarge or modify any substantive right."' *Id.* (quoting the Rules Enabling Act, 28 U.S.C. § 2072(b))." *Id.* (citations omitted). Thus, the first step for this Court's analysis is to determine whether the federal rule and state law conflict, and because they do not conflict, Mr. Day's testimony should not have been admitted. However, before reaching this analysis, it is helpful to evaluate the full reasoning of *James River*.

In *James River*, the first step was to determine whether Colorado's common law rule and Fed. R. Evid. 701 conflicted. *Id.* at 1218-19. Rapid Funding contended that the property valuation testimony of its owner, Mr. Miller, was admissible pursuant to Colorado's common law rule allowing a landowner to testify as to value of his or her property without being an expert. *Id.* The Tenth Circuit disagreed with Rapid Funding on this issue, and stated that "if Mr. Miller's testimony were evaluated for admissibility under Colorado law as lay opinion, the starting point would be Colorado Rule of Evidence 701, which is identical to

Federal Rule of Evidence 701 [].  There is no direct collision."  *Id.* at 1218-19.

The Tenth Circuit ultimately found that "[b]ecause Mr. Miller's testimony is

inadmissible under both Federal Rule 701 and Colorado Rule 701, the two rules do

not conflict." *Id.* at 1219.

Defendant argues the Kansas Rules of Evidence substantively mirror the

Federal Rules of Evidence and *disallow* such testimony to be couched as lay

opinion testimony when based upon specialized knowledge or skill.  Applying the

analysis provided in *James River*, the same conclusion must be reached.  It is true

that Kansas's Rule of Evidence on lay opinion testimony does not match the

Federal Rule of Evidence word for word, or "identically" as was the case in *James

River*, but the two rules do mirror each other in substantive application.

In Kansas, testimony based on "the type of 'interpretation of *technical* facts'

or *specialized* 'material in evidence' [] constitutes expert opinion."  *State v.

Blomquist*, 39 Kan. App. 2d 101, 114 ( 2008) (citing *State v. Struzik*, 269 Kan. 95,

99 (2000)) (emphasis added).  Therefore, we have the exact situation as addressed

in *James River*, *i.e.*, Kansas, like Colorado, allows a landowner to testify on the

value of his or her own property, but that testimony cannot be based upon

specialized skill, experience, or knowledge and be inappropriately classified as lay

opinion testimony simply because of a common law rule.  The cases relied upon by

49

Plaintiffs, where an owner is presumed to have knowledge of his/her property, do not contain a helpful analysis of the interaction of the Federal Rules of Evidence and the owner rule. *See, e.g.*, *Ultimate Chem. Co. v. Surface Transp. Int'l*, 232 Kan. 727, 729-30 (1983). Rather, this issue was squarely addressed by the Tenth Circuit. For reasons stated herein, the law of Kansas and the applicable Federal Rule of Evidence do not conflict. Kansas's common law rule allowing landowners to testify on the value of property does not foreclose the requirements of the Federal Rules of Evidence. If testimony is based upon specialized knowledge or skill, it must be subjected to scrutiny under the Fed. R. Evid. 702 and *Daubert* and its progeny. Even if there was a conflict between the law of Kansas and Rule 701, whatever conflict there may be does not "'abridge, enlarge or modify any substantive right.'" *James River*, 658 F.3d at 1218. No substantive right of Plaintiffs was altered. Rather, the procedure, *i.e.*, path to admissible evidence, by which Plaintiffs' could support their substantive right, *i.e.*, their cause of action, was accurately enforced. *See Halley v. Barnabe,* 271 Kan. 652, 662, 24 P.3d 132, 147(2001) (defining substantive and procedural law).

The Trial Court ignored Tenth Circuit precedent and allowed Mr. Day to testify as a lay witness to matters that are inarguably specialized and technical under the Federal Rules of Evidence. Knowledge of the fair market value of large

John Deere grader and other heavy machinery and equipment cannot be considered common knowledge and perception. Instead, it most certainly requires the technical knowledge that Plaintiffs advanced on behalf of Mr. Day.

**D.    Even When Allowing Mr. Day to Testify As the "Owner," the Trial Court Properly Mandated He Present Evidence of Fair Market Value Immediately Prior to and After the Fire, Which Mr. Day Could Not and Did Not Do.**

Under Kansas law, the measure of damages for completely destroyed personal property "is the difference between its fair and reasonable market value immediately before and immediately after the damage." *Ultimate Chem. Co.*, 232 Kan. at 729, 658 P.2d at 1011; PIK-Civil 4th 171.11. The same measure of damages applies to real property that is completely destroyed. *Williams v. Amoco Prod. Co.*, 241 Kan. 102, 110, 734 P.2d 1113, 1120 (1987) ("[t]he measure of damages for permanent injury is the difference in the fair market value of the land before and after injury."); *Kiser v. Phillips Pipe Line Co.*, 141 Kan. 333, 41 P.2d 1010, *Syllabus* (1935) ("[m]easure of damages for permanent injury to land is difference in fair market value of land before and after injury."); *see also* PIK-Civil 4th 171.20. Implicit in comparing market values of property immediately before and after destruction is the existence of a market value prior to destruction. "Market value means, generally, the price for which an article is bought and sold, and is ordinarily best established by sales in the ordinary course of business."

*Airight Sales, Inc. v. Graves Truck Lines, Inc.*, 207 Kan. 753, 756, 486 P.2d 835, 838 (1971).  Mr. Day failed to produce any such testimony.

On the final day of trial during Mr. Day's testimony as "owner" of the property, he again failed to offer any evidence of fair market value immediately before and immediately after the fire.  (Aplt. App. Vol. 5 at 703-792).  While on the stand, Mr. Day offered damages figures based on documents in front of him prepared at the direction of the insurance company that had a listed value of the items lost.  (Aplt. App. Vol. 5 at 771-773).  The document was not prepared by Mr. Day, and he did not assign those values for each piece of property lost.  (Aplt. App. Vol. 5 at 771-773).  As he had done throughout trial, Mr. Day again presented evidence of replacement cost, which the Trial Court properly excluded over the repeated requests of Plaintiffs' counsel to admit replacement cost evidence.  (Aplt. App. Vol. 5 at 733-778).

On cross, Mr. Day again acknowledged his lack of experience in appraising heavy equipment.  (Aplt. App. Vol. 5 at 773-774).  He admitted he had never worked for a dealer of heavy equipment or been involved in regular sales of the same.  (Aplt. App. Vol. 5 at 773-774).  As to the "new" items in the shop building, Mr. Day admitted that by "new" he meant "not used," meaning that much of the equipment was purchased long ago, but simply not used yet.  (Aplt. App. Vol. 5 at

773-774).  Again, this is not evidence of fair market value immediately before and after the fire.

As to auctions, Mr. Day admitted that he had not seen the type of equipment damaged in the fire at any auction he attended.  (Aplt. App. Vol. 5 at 778-780). Giving Mr. Day every opportunity to establish foundation, he was even asked whether he had researched the value of the used equipment on the internet, to which he responded he had not.  (Aplt. App. Vol. 5 at 778-779).  Mr. Day admitted that he had not conducted any research as to the fair market value of the heavy equipment immediately before and immediately after the fire.  (Aplt. App. Vol. 5 at 780-782).  Rather, and importantly, Mr. Day admitted that the value he assigned to the property was the value he would pay for them, and did not represent "what the market was doing at that time."  (Aplt. App. Vol. 5 at 783).  This is not evidence of what a willing buyer would pay.  This is not evidence of fair market value.  Rather, this is testimony of what Mr. Day would pay.  The owner rule does not permit the transformation of fair market value evidence into "value to me" evidence.  *United States v. Sowards*, 370 F.2d 87, 92 (10th Cir. 1966) ("the owner's qualification to testify does not change the 'market value' concept and permit him to substitute a 'value to me' standard for the accepted rule, or to

establish a value based entirely upon speculation"). Accordingly, the Trial Court properly excluded this evidence.

Plaintiffs argue that damages evidence relating to the 1981 Allis Chalmers 345 wheel loader should have been submitted to the jury on the basis that Mr. Day had received offers to purchase the same. (Appellant Brief at 11, 20). While Mr. Day testified that he received "offers" from "salesmen from various companies" and "even contractors," he failed to specify who/what these people/entities were. Nor did he testify when such "offers" were allegedly received, which would certainly be relevant to a determination of fair market value on December 18 and 19 of 2007. Moreover, he admitted on cross that as to the Allis, he had never attended auctions where he observed the same being sold, never made an inquiry of value to an Allis Chalmers dealer, and failed to even conduct a basis internet search. (Aplt. App. Vol. 5 at 782-783). Most importantly, however, Mr. Day acknowledged that with all of the equipment, he was testifying to what he personally would pay for the equipment, and not the value of the equipment on the market.

Q. And I take it you're not telling the jury and the Court what the market was on those products at that point in time, 2007?

A. No, my opinion.

Q. Of what you would pay?

A. At what I would pay myself, yes.

Q. But not what the market was doing at that time?

A. Right.

(Aplt. App. Vol. 5 at 782-783). As admitted by Plaintiffs, such evidence is not evidence of fair market value immediately before and after the incident, and thus it was properly excluded by the Trial Court.

The Trial Court also properly excluded the evidence of Lee Caster, Kechi Township's former Trustee, relating to damage to the real estate. Mr. Caster was not identified as an expert witness, nor was he offered as an expert witness. (Aplt. App. Vol. 5 at 799-800). Mr. Caster also did not possess the qualifications of an expert in the field of real estate. (Aplt. App. Vol. 5 at 799-800). In its proffer of evidence, Plaintiffs presented that Mr. Caster would testify to the value of the real estate based on an appraisal prepared by an insurance adjuster, Jess Anderson, who was not identified as a witness, expert or otherwise. (Aplt. App. Vol. 5 at 799-800). Moreover, even Plaintiffs' counsel acknowledged that Jess Anderson's report calculated replacement cost. (Aplt. App. Vol. 4 at 684 to 687). The Trial Court properly sustained Defendant's objection and adhered to its ruling relating to real estate. (Aplt. App. Vol. 5 at 799-800).

As they did at trial, Plaintiffs on appeal miss the point entirely and fail to understand that even when Mr. Day was allowed to testify as the owner, he must still present evidence of fair market value, and not simply the value to him. Plaintiffs assert that as owner, Mr. Day should have been allowed to "testify without further qualification." (Appellant Brief at 32). This assertion, however, is contrary to established Kansas law requiring evidence of fair market value. Under Plaintiffs' interpretation, Mr. Day could presumably testify to any monetary figure he values the property at, regardless of how large or small the amount, and such testimony is always admissible simply because it comes from an "owner." This interpretation is contrary to Kansas law, which requires fair market value evidence. As the Trial Court correctly noted,

> Mr. Day's evidence which -- Mr. Day is a nice guy and -- but I think he has admitted on cross-examination that -- or he has not satisfied the burden on cross-examination, even if he's the owner, to demonstrate that he is familiar with the value of any of that property according to the instructions that I'm going to give the jury. He has not attended auctions where some of that property might have been sold, or purchased and sold at the time of the fire for at least two years. He had not searched the internet, which would be certainly another way to get some idea as to the value of that type of equipment. He does get a magazine called Dirt and Gravel which might list the values of equipment, but he testified that he can't recall looking at that magazine to determine any values as to the time of the fire. He based his appraisal of the dump truck on the post-fire appraisal by someone else,

> which is hearsay.  Which could be done if he was a Rule
> 702 expert.  And similarly, he has done no research on
> the value of the Freightliner truck at the time of the fire.

(Aplt. App. Vol. 5 at 804-805).

Contrary to Plaintiffs' characterization, the Trial Court was consistent in this ruling throughout trial.  There was never a contradiction.  Evidence of fair market value immediately before and immediately after the fire was always the standard, regardless of what capacity Mr. Day or any of Plaintiffs' witnesses testified.  Oddly, Plaintiffs spend most of their appellate arguments on the notion that Mr. Day should have been allowed to testify as owner.  (Appellants' Brief at 23-33, Sections B and C).  These arguments are irrelevant to Plaintiffs' appeal, however, as Mr. Day was allowed to testify as owner, albeit incorrectly for the reasons aforementioned.  Nonetheless, despite Mr. Day being allowed to testify as owner, Plaintiffs failed to produce fair market value evidence as required by Kansas law, and the Trial Court's proper ruling excluding all other irrelevant and speculative evidence should not be disturbed.

## VI.  CONCLUSION

Defendant requests that this Court reverse and remand with directions to dismiss plaintiffs' complaint.  Alternatively, Defendant requests that this Court

affirm the underlying judgment and deny Plaintiffs' request for a new trial on damages.

## STATEMENT REGARDING ORAL ARGUMENT

Defendant requests oral argument, as it believes it will assist this Court with the fact and legal issues involved in Defendant's pre- and post-trial motions, as well as provide clarity to the details involved during the multi-day trial as found in the record.

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)(B)

The undersigned hereby certifies that the above Principal and Response Brief is proportionally spaced and is printed in the Font Times Roman with a point size 14 and contains 13,783 words. I relied on my word processor (Word 2007) to obtain the count. This word count excludes those sections not appropriately included in the word count pursuant to Fed.R.App.P.32(a)(7)(B)(iii).

I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

## CERTIFICATION OF DIGITAL SUBMISSION

I hereby certify that I have not redacted any documents; that this document is submitted in Digital PDF and has been scanned for viruses with Microsoft Security Essentials, updated today, and is free of viruses.

DATED this 13th day of November, 2012.

Respectfully submitted,


s/Alan Epstein
Alan Epstein, Esq.
HALL & EVANS, L.L.C.
1125 17th Street, Suite 600
Denver, CO 80202-2052
303-628-3300
303-293-3238 (fax)
epsteina@hallevans.com

Kenneth R. Lang
Matthew K. Holcomb
HINKLE LAW FIRM L.L.C.
8621 E. 21st Street North, Suite 200
Wichita, Kansas 67206-2991
316-267-2000
Klang@hinklaw.com
mholcomb@hinklaw.com

**ATTORNEYS FOR DEFENDANT-
APPELLEE FREIGHTLINER, LLC**

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 13th day of November, 2012, I electronically filed the foregoing using the CM/ECF system which will send notification of such filing to the following e-mail address, and, on the 14th day of November, I hand delivered 7 copies of the foregoing **APPELLEE'S PRINCIPAL AND RESPONSE BRIEF** to the Clerk of this Court:

Kenneth R. Lang
Matthew K. Holcomb
HINKLE LAW FIRM L.L.C.
8621 E. 21st Street North, Suite 200
Wichita, Kansas 67206-2991
Klang@hinklaw.com
mholcomb@hinklaw.com

Jennifer M. Hill
Kevin M. McMaster
McDonald, Tinker, Skaer, Quinn &
   Herrington, P.A.
P.O. Box 207
Wichita, Kansas  67201-0207
jhill@mtsqh.com
kmcmaster@mtsqh.com

s/Denise Gutierrez, Secretary to
Alan Epstein, Esq.
HALL & EVANS, L.L.C.
1125 17th Street, Suite 600
Denver, CO 80202-2052
303-628-3300
303-628-3368 (fax)
epsteina@hallevans.com