**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 13, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

KECHI TOWNSHIP; EMPLOYERS
MUTUAL CASUALTY COMPANY,

     Plaintiffs-
     Appellants/Cross-Appellees,

v.

FREIGHTLINER, LLC, n/k/a Daimler
Trucks North America, LLC,

     Defendant-Appellee/Cross-
     Appellant.

Nos. 12-3118, 12-3134
(D.C. No. 6:10-CV-01051-MLB)
(D. Kan.)

---

**ORDER AND JUDGMENT**[*]

---

Before **GORSUCH**, **HOLLOWAY**,[**] and **HOLMES**, Circuit Judges.

---

[*]    This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

[**]    The late Honorable William J. Holloway, Jr., United States Senior Circuit Judge, participated as a panel member when oral argument was heard in this case but passed away before having an opportunity to vote on or otherwise participate in the consideration of this order and judgment. "The practice of this court permits the remaining two panel judges if in agreement to act as a quorum in resolving the appeal." *United States v. Wiles*, 106 F.3d 1516, 1516 n.* (10th Cir. 1997); *see also* 28 U.S.C. § 46(d) (permitting a circuit court to adopt procedure allowing for the disposition of an appeal where a remaining quorum of

(continued...)

────────────────────────

After a fire destroyed its machine shop, Kechi Township ("Kechi") sued

Freightliner, LLC ("Freightliner") in a products liability action, alleging that

Freightliner's defective design of a truck ("the truck" or "the subject truck")[1]

caused the conflagration.  A jury found Freightliner liable and awarded damages.

Both parties appeal.  Kechi appeals on the ground that the district court

improperly excluded evidence from the jury's damages calculation.  For its part,

Freightliner raises two issues: (1) its motion for judgment as a matter of law

("JMOL") was improperly denied, and (2) expert testimony was improperly

admitted.  Having jurisdiction under 28 U.S.C. § 1291, we affirm the district

court's orders denying Freightliner's motion for JMOL, allowing Kechi's expert

witnesses to testify, and barring Kechi's lay witnesses from testifying as to

damages.

## I

At around 12:15 a.m. on December 19, 2007, a fire started at Kechi's

machine shop.  The fire destroyed the shop and all of its contents, including the

following pieces of heavy equipment: the subject truck, a John Deere motor

────────────────────────

[**](...continued)
panel agrees on the disposition).  The remaining panel members have acted as a
quorum with respect to this order and judgment.

[1]      The parties both refer to the vehicle as a "dump truck."  At trial,
there was testimony that it was used for "dirt hauling, gravel hauling, and general
hauling purposes."  Aplt. App. at 246 (Trial Tr., dated Jan. 11, 2012).

grader, a John Deere tractor, a John Deere mower, a John Deere Gator utility vehicle ("the Gator"), two Dixie Chopper mowers, an Allis Chalmers 345 wheel loader ("the wheel loader"), and a Chevy dump truck. After an investigation traced the fire to the subject truck, Kechi sued Freightliner based on the truck's allegedly defective design in Kansas state court. The case was later removed to federal district court on diversity grounds.

Prior to trial, Freightliner filed motions to exclude the testimony of Kechi's two expert witnesses: Don Birmingham, a fire-origin expert, and Jim Martin, a fire-causation expert. Freightliner argued that the experts never inspected any of the company's design drawings or specifications, that they performed inadequate research into the origin of the fire, and that they used an untrustworthy exemplar truck and battery in their investigations. After conducting a *Daubert*[2] hearing, the district court denied the motion to exclude Mr. Martin's testimony, finding that the absence of the specifications and the reliability of the exemplars were matters for the jury and that Mr. Martin was not obliged to rule out every possible explanation for the fire. The district court also largely denied the motion to exclude Mr. Birmingham's testimony, though it barred him from testifying as to the combustibility of the truck's insulation.

During trial, Kechi attempted to elicit from James Day, the man in charge

---

[2]     *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

of the machine shop, testimony regarding the value of the real estate and personal property destroyed in the fire.  Freightliner filed a motion to exclude Mr. Day's testimony on damages, urging the court to "disallow Mr. Day [from] testify[ing] as a lay witness [to] values of the various pieces of [personal] property and real property when such testimony is plainly expert testimony under federal law." Aplt. App. at 77 (Mot. & Supp. Mem. to Exclude Pls.' Damages Evidence, filed Jan. 16, 2012).  The district court granted the motion with respect to the real property on the grounds that the testimony at issue was based entirely on an appraisal performed by a third party, and thus constituted hearsay.

After oscillating somewhat on the question of the personal property, the district court ultimately concluded that it would exclude from the jury's consideration damages testimony relating to any heavy equipment *other than* the Gator, the property in the Gator, and certain shop supplies and equipment, reasoning that Mr. Day had not demonstrated sufficient familiarity with the value of any of the other items.  The court likewise declined to allow Lee Caster, who was apparently a trustee on the township board,[3] to testify to the value of the real estate, ruling that there were "certainly very valid ways to put on testimony as to the value of the building [but] that has not been done."  *Id.* at 800 (Trial Tr.,

---

[3]      From the briefing and transcript, it is not clear precisely what Mr. Caster's title was at the time he testified.  It makes no difference to our analysis.

dated Jan. 17, 2012).[4]

During its deliberations, the jury had before it a verdict form that asked it to itemize damages with respect to only three different things: the Gator, the property in the Gator, and certain "shop supplies and equipment." *Id.* at 129 (Verdict, dated Jan. 19, 2012) (capitalization altered). The jury found Freightliner liable for the fire and awarded $21,000 in damages.

The jury's verdict rendered, Freightliner renewed an earlier-filed motion for JMOL pursuant to Federal Rule of Civil Procedure 50. The district court denied the motion, declining to "find as a matter of law that the evidence offered was overwhelmingly preponderant in favor of [Freightliner]." *Id.* at 201 (Order, filed March 29, 2012). Both parties appealed.

## II

We first consider Freightliner's challenge to the district court's denial of its motion for JMOL. Such decisions are reviewed de novo, applying the same standard the district court did—namely, that "[a] party is entitled to judgment as a

---

[4] As the preceding summary indicates, the district court's basis (or bases) for excluding the testimony is unclear, as the court had earlier cited foundation and hearsay concerns, but much of the debate between the parties concerned the interplay between expert and lay opinion rules. Because the parties now focus on the latter, and because the district court's ruling can properly be affirmed on that ground, we limit our discussion to that issue. *See United States v. McGlothin*, 705 F.3d 1254, 1266 n.17 (10th Cir.) (reiterating that we are authorized to "affirm the district court's evidentiary rulings on any basis that finds support in the record"), *cert. denied*, --- U.S. ----, 133 S. Ct. 2406 (2013).

matter of law 'only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position.'" *Hysten v. Burlington N. Santa Fe Ry. Co.*, 530 F.3d 1260, 1269 (10th Cir. 2008) (quoting *Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 812 (10th Cir. 2000)).

With respect to the arguments concerning the admission of the expert testimony, "we review de novo the question of whether the district court applied the proper standard and actually performed its gatekeeper role in the first instance" and then "review the trial court's actual application of the standard in deciding whether to admit or exclude an expert's testimony for abuse of discretion." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1223 (10th Cir. 2003). Freightliner questions the district court's actual application of the standard; it does not contend that the court used the wrong standard or failed to perform its gatekeeper role. Accordingly, we will reverse only if we find an abuse of discretion.

Lastly, we review the district court's exclusion of the damages testimony under an abuse-of-discretion standard. *See James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1212 (10th Cir. 2011).

### III

In overview, we hold that: (1) Freightliner's motion for JMOL was properly denied; (2) the district court did not abuse its discretion in admitting Kechi's expert testimony; and (3) the district court did not abuse its discretion in

excluding Kechi's damages testimony.  Our holdings compel us to affirm each of the district court's challenged rulings.

## A

The first issue presented is whether the district court correctly denied Freightliner's motion for JMOL.  Under Kansas law,[5] strict liability for the sale or manufacture of a product is only imposed where the plaintiff shows that: "(1) the injury resulted from a condition of the product; (2) the condition was an unreasonably dangerous one; and (3) the condition existed at the time [the product] left the defendant's control."  *Jenkins v. Amchem Prods., Inc.*, 886 P.2d 869, 886 (Kan. 1994) (quoting *Mays v. Ciba-Geigy Corp.*, 661 P.2d 348, 359 (Kan. 1983)) (internal quotation marks omitted).  At trial, Kechi submitted evidence on two alleged design defects in the starter motor of the subject truck: (1) the use of a bus bar[6] or depopulation stud,[7] and (2) the use of a cap nut.[8]  It

---

[5]    Throughout these proceedings, the parties have rightly agreed that Kansas law governs the substantive question of liability, and the district court applied that law.  *See Elm Ridge Exploration Co. v. Engle*, 721 F.3d 1199, 1210 (10th Cir. 2013) ("A federal court sitting in diversity applies the substantive law of the state where it is located . . . .").

[6]    According to trial testimony, a bus bar is a "wide electrical conductor."  Aplt. App. at 512 (Trial Tr., dated Jan. 12, 2012).

[7]    As with many of the technical details in this case, the relationship between the bus bar and the depopulation stud is unclear and is not illuminated by the briefing.  At times, the two objects are discussed in the alternative.  *See, e.g.*, Aplt. Opening Br. at 3 (discussing testimony "that the use of a busbar *or* depopulation stud . . . caused a loose connection . . . ." (emphasis added)).  At

(continued...)

argued that both defects caused loose connections in the motor, which in turn caused the fire.  As explained below, Kechi made each of the showings required by Kansas law, and the district court therefore properly denied Freightliner's motion for JMOL.

## 1

In regards to the first element—the causal connection between the defect and the injury—Freightliner submits that it was entitled to JMOL because Mr. Martin, Kechi's expert, attributed the ultimate cause of the fire to "a fault or short, and not the loose connection" in the subject truck's motor.  Aplee. Opening Br. at 18.  Freightliner also maintains that Kechi "failed to sufficiently eliminate other reasonable causes of the fire."  *Id.* at 22.

### a

Freightliner's suggestion that Mr. Martin's testimony does not sufficiently establish causation parses the legal standard more finely that the cases permit.  In products liability actions in Kansas, "[p]roximate causation in a proper case may

---

[7](...continued)
others, the depopulation stud is characterized as an element of the bus bar.  *See, e.g.*, Aplt. App. at 545 ("I noticed the cap nut *on the bus bar depopulation stud* . . . ." (emphasis added)).  For present purposes, the distinction is not germane.  The important thing to remember is that the depopulation stud is associated with the bus bar, not the B+ terminal, a different component discussed shortly.

[8]     There was evidence at trial that a cap nut (also referred to in places as a "capped nut") is a "closed-off nut," in contrast with an "open" or "uncapped nut."  Aplt. App. at 1329 (Dep. of Michael Stohler, taken May 2, 2011).

be shown by circumstantial evidence." *Dieker v. Case Corp.*, 73 P.3d 133, 145–46 (Kan. 2003) (quoting *Farmers Ins. Co. v. Smith*, 549 P.2d 1026, 1033 (Kan. 1976)) (internal quotation marks omitted). A proximate cause is one "which in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury, and without which the injury would not have occurred." *Rhoten v. Dickson*, 223 P.3d 786, 801 (Kan. 2010) (quoting *Yount v. Deibert*, 147 P.3d 1065, 1070 (Kan. 2006)) (internal quotation marks omitted).

Mr. Martin testified that "[w]hen these connections get loose, we produce the resistance, we produce the heat, it begins to melt the insulation." Aplt. App. at 585. Asked on cross-examination whether the heat he held responsible for starting the fire "was *created* by a loose nut," he responded, "Two loose nuts." *Id.* at 613 (emphasis added). His other statements from the witness stand were entirely consistent with this theory. *See, e.g.*, *id.* at 589 (summarizing the chain of events leading to the fire). Freightliner homes in on a passage in Mr. Martin's testimony where he opined that the looseness "contributed to the heat that produced degradation of the insulation that ultimately resulted in the short" that consequently caused the fire. *Id.* at 620. Seen in the light of his other statements quoted above, as well as in the light of the overall thrust of his testimony, it is obvious that Mr. Martin was *not* saying that the looseness was but one of several causes, each of which could have independently produced the fire; rather, he was characterizing the looseness as the first event that kicked off a "natural and

9

continuous sequence, unbroken by an efficient intervening cause," which ultimately led to the fire. *Rhoten*, 223 P.3d at 801 (quoting *Yount*, 147 P.3d at 1070) (internal quotation marks omitted).

Fatally, Freightliner does not point to any *other* original cause highlighted by Mr. Martin, and a review of the record does not reveal one. It is certainly the case that, as Freightliner notes, Mr. Martin indicated that it was ultimately a short that sparked the flame. But Mr. Martin very clearly theorized that the short itself was caused by the loose connection. To claim that the short severed the causal connection between the looseness and the fire would turn causation analysis into an absurd, impracticable framework. If there is no causation here, it would be difficult to see how there would be causation when, say, an individual shoots someone, as a series of mechanical events occurs between the pulling of the trigger and the entry of the bullet. *Cf. Yount*, 147 P.3d at 1074 ("[A]lthough it cannot be said with absolute mathematical certainty that the defendants' activities caused the house fire, there certainly appears to be sufficient circumstantial evidence to create a question of fact concerning causation."). "It is quite proper to use expert testimony to prove the cause of a fire," *Smith*, 549 P.2d at 1033, and when a loose connection leads to a series of events that culminates in a fire, the loose connection is plainly the proximate cause of the fire, *see id.* at 1034.

### b

Turning finally to Freightliner's contention that Kechi "failed to

sufficiently eliminate other reasonable causes of the fire," Aplee. Opening Br. at 22, the contention cannot be sustained.  Mr. Birmingham, the fire-origin expert called by Kechi, testified that he follows a scientific approach in his work, which involves collecting data, developing a hypothesis, testing the hypothesis, and, if the hypothesis does not hold up, rejecting it and starting anew.  His investigations typically begin with an inspection of the scene and an examination of the fire patterns.

Mr. Birmingham followed the same practice in investigating the Kechi machine-shop fire.  While conducting his inspection, Mr. Birmingham's attention was drawn to the subject truck because of the unusual way in which it had been damaged by the fire.  In total, he was at the scene for about two hours "looking for an area of origin" before he "finally focused in on this truck."  Aplt. App. at 351.  Because he suspected that the fire began around the starter area of the subject truck, he called Mr. Martin, the electrical engineer, to look into that possibility.  During his testimony, Mr. Birmingham was asked what sort of burn patterns he would expect to see had the fire started in a trash can, as Freightliner speculated (and continues to speculate) may have happened.  In that event, he responded, the fire damage would have been distributed throughout the structure in a different fashion, and the damage to the truck itself would have differed in terms of where it was most badly burned.

Mr. Birmingham's testimony more than sufficiently excluded potential

sources of the fire to get the question of causation to the jury. As noted, he followed a scientific process and offered a reasonable explanation as to why he traced the fire to the subject truck and not another source. If the jury was unpersuaded, it could have voted for no liability, but there was no reason for the district court to usurp its function and decide the matter itself on a motion for JMOL. *Cf. Smith*, 549 P.2d at 1034 (reversing the exclusion of expert testimony because "[b]y [the expert's] elimination of other possible causes for the fire it would appear that his conclusion was reasonable that the fire was the result of some defect in the mobile home's electrical system"). In summary, Freightliner's arguments on causation are meritless.

## 2

Turning to the second element—that "the condition was an unreasonably dangerous one," *Jenkins*, 886 P.2d at 886 (quoting *Mays*, 661 P.2d at 359) (internal quotation marks omitted)—Freightliner avers that Mr. Martin never testified that the use of a bus bar or cap nut is defective in all circumstances. It further avers that no evidence showed how the cap nut might have become loosened from the terminal and that, at any rate, Mr. Martin thought heat would not have resulted from such a loosening. Finally, Freightliner insists that the evidence in fact suggested that the connection was tight—as it was in the exemplar truck and exemplar cable that the experts used for comparison purposes. We are constrained by Kansas law to reject each of these contentions.

A product is unreasonably dangerous when it "is 'dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.'" *Delaney v. Deere & Co.*, 999 P.2d 930, 944 (Kan. 2000) (quoting Restatement (Second) of Torts § 402A cmt. i) (1965)).

At trial, the jury was read excerpts of the deposition testimony of Michael Stohler, a special investigator for Delco Remy ("Delco"), the company that manufactured the truck's starter. In one of those excerpted passages, Mr. Stohler testified that "every electrical connection" must be "secure[d] . . . correctly," or "bad things happen." Aplt. App. at 1292–93. He further testified that a loose connection in a motor like the subject truck's could create a situation in which it is "[p]retty intense, pretty hot for a relatively short period of time." *Id.* at 1293. Later in the deposition, Mr. Stohler was asked what danger arose from the use of a bus bar bracket or depopulation stud on B+ starter terminals, and he responded that "[s]parks fly." *Id.* at 1305. Mr. Martin confirmed all of these opinions in his own testimony. Specifically, he agreed that "[w]hen these connections get loose, we produce the resistance, we produce the heat, it begins to melt the insulation." *Id.* at 585. And he characterized as loose the connections at both the bus bar and the B+ terminal.

Putting this testimony together, the jury could reasonably have inferred that the loose connections in the starter posed the risk of causing a fire. It is beyond

13

peradventure that an ordinary consumer buying a dump truck does not expect it to burst into flames. *Cf. Betts v. Gen. Motors Corps.*, 689 P.2d 795, 799 (Kan. 1984) (holding that a jury could have properly found that a design defect was unreasonably dangerous where it led to the placement of a fuel tank in a part of the car where it later caused a fire when punctured in an accident). The "unreasonably dangerous" element was satisfied for JMOL purposes.[9]

**3**

The third element of strict products liability claims is that "the condition existed at the time [the product] left the defendant's control." *Jenkins*, 886 P.2d at 886 (quoting *Mays*, 661 P.2d at 359) (internal quotation marks omitted). On this element, Freightliner reads Mr. Martin's testimony as expressing the view that loose connections were likely not an issue when Freightliner first shipped the truck from its plant. Freightliner also attacks Mr. Martin's supposed view "that the nut magically backed off the stud" as "illogical." Aplee. Opening Br. at 13. It stresses that Freightliner shipped the truck as a chassis only and that the truck

---

[9]     Freightliner makes much of the fact that Kechi "did not seek even the most basic of fact discovery" to ascertain whether the alleged defects were part of Freightliner's design. Aplee. Opening Br. at 23. However, it points to no legal obligation on the part of Kechi to do so. Kechi's discovery strategy is irrelevant to its satisfaction *vel non* of its burden of proof. It either presented sufficient evidence or it did not; it is of no significance where it did or did not get that evidence. Kechi got enough of it, and there was therefore sufficient evidence on the unreasonable dangerousness of the truck for Kechi to advance this element of its claim to the jury.

was repaired and modified a number of times, thus increasing the likelihood that no defect was present at the time the truck left Freightliner's control.  Again, Freightliner's arguments do not justify reversing the district court's denial of the motion for JMOL.

At the deposition of Mr. Stohler (Delco's special investigator), an attorney read from a Delco bulletin instructing purchasers of its starters, "[D]o not install a bus bar bracket or de-population stud on the B plus starter terminals as these apply excess mechanical loads and create a safety hazard."  Aplt. App. at 1300–01.  Mr. Stohler was later asked if capped nuts could be used for B+ terminals on the subject truck model, and he responded that they should not because "they can bottom out on some type[s] of terminals so you couldn't get that tight connection."  *Id.* at 1329.  The problem with capped nuts, he explained, was that they can "be very deceiving as far as whether or not you have something tight."  *Id.* at 1331.  Mr. Stohler had this to say about who provided which parts: "[Delco] suppl[ies] . . . an interior nut on the solenoid, and we have an exterior, which they take off, put their cables on and then torque it back down.  So we supply those nuts.  Anything additional to that, they supply."  *Id.* at 1327.[10]

---

[10]     Freightliner interprets this testimony to mean "that Delco Remy is responsible for the nut on the B+ terminal, and not" Freightliner.  Aplee. Reply Br. at 3.  A juror might agree.  Then again, he might not.  Not that long after Mr. Stohler made this comment, he was asked, "If that had been a tight connection and a proper connection according to Delco standards . . . would there have been

(continued...)

Seeking clarification, the attorney later asked him,

> So you're not necessarily going to worry about what the wires
> look like that are connected to it because you're just selling the
> starter with the nut on it, and then it's up to the [purchaser] to
> make the connections and replace it and put the proper torque on
> it; is that correct?

*Id.* at 1345.  Mr. Stohler agreed that it was.

None of this testimony is a paradigm of clarity.  Reading the transcripts, it is often unclear which part of the starter is under discussion, and the witnesses were not always as responsive to the questions as one might have hoped. Nevertheless, the testimony, such as it is, survives a JMOL challenge.  This is so because the evidence surveyed above provided a basis for the jury to find that (1) Freightliner improperly used a bus bar, and (2) Freightliner improperly used a capped nut in its starter.  Kechi needed nothing more to surmount the motion for JMOL.

Though Freightliner makes much hay of Mr. Martin's view that the connection likely was not loose when Kechi purchased the subject truck, that view is irrelevant to Kechi's theory of liability.  Kechi never argued that the connection was loose from the moment it acquired the truck.  Its argument has

---

[10](...continued)
any heat escaping that connection?"  Aplt. App. at 1351.  He responded, "[T]here'd be no problem with that connection."  *Id.*  Given that statement, and given the fact that his earlier remarks left open the possibility that Freightliner *could* have replaced the nut on the B+ terminal, a juror could have inferred that Freightliner, and not Delco, was responsible for the nut on the B+ terminal.

always rested on the supposition that the design defect *led to* the loose

connection, and the loose connection in turn led to the fire.  And that theory is

entirely consistent with what the jury heard about capped nuts and bus bars.  *See*

*id.* at 1300–01 ("[D]o not install a bus bar bracket or de-population stud on the B

plus starter terminals as these apply excess mechanical loads and create a safety

hazard." ); *id.* at 1329 (capped nuts "can bottom out on some type[s] of terminals

so you couldn't get that tight connection"); *id.* at 1331 (capped nuts can "be very

deceiving as far as whether or not you have something tight").

Freightliner's suggestion that Kechi's case rested on an "illogical" narrative

whereby "the nut magically backed off the stud," Aplee. Opening Br. at 13, fares

no better.  If Freightliner means to say that the loosening of a connection over

time is "illogical" and "magical," that is simply not so.  *Cf. In re Rhoten*, 397

F. Supp. 2d 151, 165 (D. Mass. 2005) (finding negligence where a "failure to

affix the proper locking device to . . . power cords . . . caused the *development of*

*the loose connections*," which in turn caused an electrical fire (emphasis added)).

In *Smith*, to be sure, the Kansas Supreme Court did hold that a directed verdict

was properly granted against the plaintiffs when they had no evidence that loose

electrical connections in a mobile home existed at the time the mobile home left

the manufacturer's control.  *See* 549 P.2d at 1035.  But the court did so because

the plaintiffs' expert "specifically testified that he looked for an[d] found no

direct evidence of loose connections," but "simply inferred that somewhere in that

17

area there was a loose electrical connection," and provided no reason to think it was the fault of the manufacturer. *Id.* This is quite a different case. Kechi presented the testimony of two individuals, both thoroughly acquainted with the engineering of the starter at issue, both of whom found the connections loose, and both of whom provided reasons to trace the looseness back to the original design.[11]

Freightliner's speculations about what may have transpired after Kechi bought the subject truck likewise do nothing to shake the district court's JMOL ruling. Mr. Martin testified that the exemplar cable he inspected was "essentially . . . identical" to that in the subject truck, an opinion he formed after visually examining the two cables and noticing that the exemplar cable said "Freightliner" on it and had what Mr. Martin "believe[d] to be a Freightliner number" written on it as well. Aplt. App. at 569–70. The exemplar cable had the same configuration as the subject truck's cable, including the alleged design defects that led to the fire. Given this explanation, it was reasonable of Mr. Martin to rely upon the exemplar, and also reasonable of the jury to base its own inferences on his comparison. *Cf. Kerrigan v. Maxon Indus., Inc.*, 223

---

[11]     Freightliner also relies upon *Jacobson v. Ford Motor Co.*, 427 P.2d 621 (Kan. 1967), for this point, but *Jacobson* dealt with an incomplete record, a car that had been involved in an accident, and no apparent evidence that the defect existed at the time it left the manufacturer's control, *see id.* at 623–24, none of which can be said here.

F. Supp. 2d 626, 642–43 (E.D. Pa. 2002) (permitting an expert witness to testify regarding an exemplar where it and the subject machine "were manufactured with the same specifications," even though one "was in a different condition, whether due to poor maintenance or to the accident or otherwise"). Mr. Martin's analysis of the exemplar tends to suggest that the defect accompanied the starter off Freightliner's lot.

Furthermore, on direct examination, Mr. Day, the man in charge of the machine shop, was asked "whether or not any large repairs were done to the truck" in the sense of anything "other than routine oil changes, things of that nature." Aplt. App. at 248. His response was definitive: "No. Other than the clutch being changed. Nothing else happened to it." *Id.* This testimony further supported Kechi's position that it acquired the subject truck with the defect. *Cf. Donegal Mut. Ins. v. White Consol. Indus., Inc.*, 852 N.E.2d 215, 227 (Ohio Ct. App. 2006) (finding sufficient evidence that a design defect was present when it left the manufacturer's control where the owner of the product testified that no repairs had been made to it).

Freightliner notes, however, that a third party modified the truck before it came into Kechi's possession and that the modifications "no doubt required re-routing of the wiring to accommodate the new features." Aplee. Opening Br. at 13. It would have been inappropriate for the district court to grant Freightliner's motion for JMOL on the basis of such a speculative assertion, when a jury could

just as reasonably infer from Kechi's evidence that the defect existed at the time

Freightliner relinquished control of the subject truck.  All of which is to say that

there was sufficient evidence from which the jury could reasonably have inferred

the correctness of Kechi's theory, and that was all it needed to survive the motion

for JMOL.  *See, e.g.*, *Bannister v. State Farm Mut. Auto. Ins. Co.*, 692 F.3d 1117,

1126 (10th Cir. 2012).

Freightliner maintains, ostensibly as a separate argument from its claims

regarding the elements of strict products liability, that Kechi's case was

impermissibly built upon the "stacking of inferences."  Aplee. Opening Br. at 19.

The inferences it discerns are (1) "that the design of the exemplar truck included

a bus bar and cap nut"; (2) that the exemplar truck's design reflected that of the

subject truck; and (3) "that a bus bar and cap nut [were] present at the time the

truck left [Freightliner's] control."  *Id.* at 20–21.

"[P]iling presumption and inference upon presumption and inference" is not

allowed in Kansas, as "a burden of proof may not be met by mere conjecture."

*McKenzie v. N.Y. Life Ins. Co.*, 112 P.2d 86, 90 (Kan. 1941).  In an instructive

passage, the *McKenzie* court recited the presumptions and inferences necessary to

substantiate liability:

> To find otherwise the jury would be compelled to presume or
> infer, in the absence of any evidence on the matter, that the
> drinking glass had contained bromides; that Dr. McKenzie had
> taken bromides from it; that the dose was an *overdose*; that such
> overdose was taken *accidentally* and that such accidental

20

> overdose was the cause of death without regard to the acute and chronic disease of vital organs disclosed by the post-mortem examination . . . .

*Id.* It does not take much to see how inapplicable this language is to the case at bar. *McKenzie* mentions five inferences; each is necessary *in combination* to reach the result. *See id.* Here, the only inferences the jury would have to draw from the evidence to find the element satisfied would be either (1) that the identity of the exemplars with the subject truck parts suggests that the defects existed at the time the truck left Freightliner's control, *or* (2) that the testimony that Kechi never had significant repairs done suggests the same. Both are reasonable, and each is sufficient *standing alone*.

In recognition of the fact that it will often be difficult to prove with direct evidence the control element, the Kansas Supreme Court has declined to unsettle a jury verdict where the element was met purely on the basis of testimony that a defective part had not been tampered with after purchase. *See Dieker*, 73 P.3d at 147.[12] There is even less reason to do so in the present case, where the exemplar testimony militates in favor of the same result. Accordingly, all of the elements of strict products liability were sufficiently met for the jurors to cast their votes. We therefore affirm the district court's order denying Freightliner's motion for

---

[12]    *Dieker* mentions other facts in its analysis, but none go to the question of whether the defect may have arisen later, which is the precise point at issue here. *See* 73 P.3d at 147.

JMOL.

**B**

The JMOL issue resolved, we next consider Freightliner's argument that Kechi's experts should not have been allowed to testify.  Expert testimony in federal court is governed by Federal Rule of Evidence 702,[13] which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Reliability is looked at in light of a number of non-exhaustive, "nondispositive factors: (1) whether the proffered theory can and has been tested; (2) whether the theory has been subject to peer review; (3) the known or potential rate of error; and (4) the general acceptance of a methodology in the relevant scientific community."  *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir.

---

[13]    The parties correctly agree that federal law governs this question. *See Sims v. Great Am. Life Ins. Co.*, 469 F.3d 870, 879 (10th Cir. 2006) (noting that the doctrine of *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), does not govern Federal Rules of Evidence that were passed by Congress as part of the original Rules); *see also* An Act to Establish Rules of Evidence for Certain Courts and Proceedings, Pub. L. No. 93-595, 88 Stat. 1926 (1975) (Congress enacting Rule 702); *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (noting that the Federal Rules of Evidence govern the admissibility of expert testimony in a diversity case); *US Salt, Inc. v. Broken Arrow, Inc.*, 563 F.3d 687, 691 (8th Cir. 2009) (same).

2006).  We have emphasized that this framework is a "flexible" one, *United States v. Turner*, 285 F.3d 909, 912 n.4 (10th Cir. 2002), and have acknowledged a district's court's "broad discretion to consider a variety of other factors," *Dodge*, 328 F.3d at 1222.[14]

Freightliner challenges the reliability of both of Kechi's experts.  As explained shortly, Mr. Birmingham's opinions were reliable because he followed a methodical, scientific process, and because his failure to interview two employees of the machine shop was not fatal in light of his thorough investigation of the scene and compelling reasons for tracing the fire to the subject truck.  Similarly, Mr. Martin's opinions were reliable because he presented a detailed

---

[14]     In Kechi's view, Freightliner fails to argue the proper standard of review on this issue—abuse of discretion—and thereby waives any claim against the testimony of either witness.  But in its first brief, Freightliner did indeed clearly and accurately state the proper standard of review.  *See* Aplee. Opening Br. at 24 ("This Court reviews *de novo* whether the trial court properly performed its role as 'gatekeeper,' and reviews for an abuse of discretion the manner in which the role is performed."); *United States v. Allen*, 603 F.3d 1202, 1212 (10th Cir. 2010) (stating the same).  Although Kechi takes Freightliner to task for not reiterating this same standard every time it articulates the district court's purported error, our law does not require such a strained, technical, impractical application of briefing standards.  *See* Fed. R. App. P. 28(a)(8)(A) (providing that an appellant's argument section in its brief "must contain . . . appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies").  Freightliner properly alerted us to the appropriate standard of review and then explained the errors it believes constitute abuses of discretion.  In so doing, it saved us the burden of "mak[ing] arguments for [it]," *United States v. Yelloweagle*, 643 F.3d 1275, 1284 (10th Cir. 2011), and thus did not waive anything on appeal as respects the standard of review governing this issue.

theory as to how the fire began, based on his extensive training, his diligent inspection of the scene and the subject truck, and his use of trustworthy exemplars. As a result, we affirm the district court's decision to allow both experts to testify.

## 1

It is Freightliner's position that Mr. Birmingham, the fire-origin expert, should not have been allowed to testify because he failed to investigate "numerous burn patterns throughout the building," and because he neglected to account for the possibility that the fire may have been started by a wood-burning stove in the shop or by the disposal of its ashes in a plastic container. Aplee. Opening Br. at 33. Along the same lines, Freightliner finds that Mr. Birmingham's decision not to interview two employees at the shop rendered his investigation into the fire fatally defective and violated the National Fire Protection Association's "NFPA 921" recommendations for fire investigations.

Freightliner's assertions regarding Mr. Birmingham's investigation are not borne out by the record. First, as Kechi rightly notes, Mr. Birmingham flatly and repeatedly stated that he *was* familiar with NFPA 921 and *did* follow it in his investigation. *See* Aplt. App. at 1147–48, 1180 (*Daubert* Hr'g Tr., dated Jan. 4, 2012). And there is no evidence to the contrary. Furthermore, even if the district court had questioned the credibility of this testimony (which it did not), that would not have been an appropriate reason to exclude it. *See Compton v. Subaru*

24

*of Am., Inc*., 82 F.3d 1513, 1520 (10th Cir. 1996) (holding that a district court properly allowed an expert to testify despite an "extremely low" opinion of his credibility because "the weight and credibility of [his] testimony were issues for the jury"), *overruled on other grounds by Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999); *see also Lapsley v. XTEK, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) ("A *Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy."). Moreover, assuming *arguendo* that it could be demonstrated that Mr. Birmingham did not follow NFPA 921, it is far from evident that, in itself, this would compel exclusion. *See Russell v. Whirlpool Corp.*, 702 F.3d 450, 455 (8th Cir. 2012) (holding that while "NFPA 921 qualifies as 'a reliable method endorsed by a professional organization,'" it is not "the *only* reliable way to investigate a fire" (quoting *Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.*, 394 F.3d 1054, 1058–59 (8th Cir. 2005)) (internal quotation marks omitted)).

Moreover, Mr. Birmingham's failure to speak with the two employees did not render his opinion unreliable under Rule 702. Mr. Birmingham had conducted over 1000 fire investigations prior to the hearing, more than two dozen of which concerned vehicles; he had worked in the field since 1979; and he had attended "numerous" training and certification seminars, Aplt. App. at 1146. At the *Daubert* hearing, Mr. Birmingham testified that after inspecting the area and the fire patterns, he "narrowed the area of origin down to" the subject truck. *Id.* at

25

1142. It was no abuse of discretion for the district court to find this investigation sufficiently reliable for Mr. Birmingham to appear before the jury.

Freightliner presents no authority holding that an expert is required to interview every potential source of information in order to pass the *Daubert* test. It is especially noteworthy that Mr. Birmingham indicated that he surveyed the fire patterns on the premises and "narrowed" the potential sources of the fire down to the subject truck, *id.*, as his wording suggests that he conducted a broad inspection of the shop and excluded other potential origins before arriving at his theory. That is exactly how an expert is supposed to operate. *See* Fed. R. Evid. 702 advisory committee's note (2000) (noting that a district court should ask "[w]hether the expert has adequately accounted for obvious alternative explanations" in evaluating reliability under Rule 702); *cf. In re Cooper Tire & Rubber Co.*, 568 F.3d 1180, 1188 (10th Cir. 2009) (giving persuasive weight to advisory committee notes while interpreting the Federal Rules of Civil Procedure); *Martinez v. Sullivan*, 881 F.2d 921, 928 (10th Cir. 1989) (giving persuasive weight to advisory committee notes while interpreting the Federal Rules of Evidence); *cf. also Square D Co.*, 470 F.3d at 990–91 (determining that the district court did not abuse its discretion in excluding expert testimony where the expert fire investigator failed to discount another possible cause of the fire).

As Kechi fairly remarks, if Freightliner had concerns about the thoroughness of Mr. Birmingham's investigation, it could easily have expressed

26

those through cross-examination and closing argument.  *Cf. Gomez v. Martin*

*Marietta Corp.*, 50 F.3d 1511, 1519 (10th Cir. 1995) (concluding that expert

testimony was not impermissibly speculative in part because the other side "cross-

examined [the] expert on the asserted weaknesses of [the expert's] assumptions

and presented expert testimony in its favor.  While the weaknesses in the data

upon which [the] expert relied go to the weight the jury should have given her

opinions, they did not render her testimony too speculative as a matter of law.").

There was no abuse of discretion in admitting Mr. Birmingham's testimony.

**2**

Freightliner believes that testimony by Kechi's other expert, Mr.

Martin—the electrical engineer who studied the fire's cause—was also admitted

in error.  In particular, Freightliner argues that because "Mr. Martin did not

consult, review, or analyze a single design drawing relating to" the subject truck,

he "possessed no knowledge of [Freightliner's] design process" and thus "should

not have been allowed to offer any opinions" regarding the truck.  Aplee. Opening

Br. at 26.  Freightliner targets Mr. Martin's testimony regarding the exemplar

parts in particular, as he failed to personally examine the exemplar truck, which

allegedly "was of unknown origin, unknown use, and unknown repair history."

*Id.* at 27.  Similarly, according to Freightliner, Mr. Martin had no assurance that

the exemplar cable was identical to the one from the subject truck or that it was

manufactured by the same company.

27

Freightliner finds further fault with Mr. Martin for flouting the
recommendations advanced by NFPA 921—specifically, its instruction to exclude
all potential causes of a given fire by process of elimination—which he did not
heed when he "rest[ed] fully on the assumptions of Mr. Birmingham as to fire
origin, and subsequently concerned himself and his opinions only with the
incident truck." *Id.* at 29–30.  Lastly, Freightliner takes issue with Mr. Martin's
testimony at the hearing regarding how insulation in the truck spread the fire, as
he "admitted that he was only *assuming* that the cables were insulated" with a
flammable substance and had no actual knowledge on the issue.  *Id.* at 30.

As with its grievances concerning Mr. Birmingham's reliability under Rule
702, Freightliner's problems with Mr. Martin's testimony all boil down to a
complaint that he did not perform the investigation a different expert might have
performed; the grievances do not shake the district court's reliability
determination regarding the investigation Mr. Martin actually *did* perform.  That
investigation was unquestionably thorough.  At the *Daubert* hearing, Mr. Martin
recounted his forty-one years of experience in the field and his investigation of
approximately 1200 fires, roughly 150 of them involving vehicles.  He then
presented a detailed theory as to how the fire began, with reference to highly
specific components of both the exemplar engine and the destroyed truck's

engine, both of which he had spent considerable time studying.[15]  The district court acted well within its discretion in finding his explanation sufficient to permit him to testify as an expert.

Freightliner's protestations notwithstanding, the law did not require Mr. Martin to consult design drawings in order to offer his opinion on the fire, given that he based his opinions on a perfectly plausible alternative method: extensive study of the subject truck's engine and comparison of that engine with an exemplar.  *Cf. Bourelle v. Crown Equip. Corp.*, 220 F.3d 532, 536–37 (7th Cir. 2000) (affirming a district court that properly excluded expert testimony where the expert failed to prepare design drawings *and* failed to do anything else that would have rendered his opinion reliable under *Daubert*).  Moreover, Mr. Martin offered a perfectly plausible explanation for why he felt no need to examine any design drawings—that is, because the physical evidence at the scene of the fire was sufficient in view of the fact that he understood "how the system is configured."  Aplt. App. at 1205.  To impose the narrow and confining

---

[15]    Mr. Martin's theory of the fire, as expressed at the *Daubert* hearing, was as follows: Mr. Birmingham directed him to the subject truck as the likely point of origin.  While inspecting the area around the truck, Mr. Martin discovered that two of the terminals on one of the cables were welded together, suggesting the work of excessive heat.  He also noticed that one of the nuts was loose, and he was aware that such looseness could produce heat.  His inspection of the insulation at the scene and his comparison with the insulation of the exemplar cable indicated to him that the fire had spread through the insulation material.

requirement on an expert that Freightliner proposes would convert the "flexible" *Daubert* inquiry, *United States v. Baines*, 573 F.3d 979, 988 (10th Cir. 2009), into an overbearingly rigid one.

Freightliner's contentions regarding the exemplars are similarly unavailing. Mr. Martin explained that he relied upon the exemplar cable to form an opinion about the fire because it had a part number consistent with the part number of the subject truck's cable, because it said "Freightliner" on it, and because the cables had the same configuration. These are all good enough reasons for purposes of *Daubert*'s reliability inquiry. Of course Mr. Martin could not be 100% sure the cables were identical, but Rule 702 does not require "absolute certainty." *Gomez*, 50 F.3d at 1519 (quoting *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988)) (internal quotation marks omitted). All that is required is "that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts that satisfy Rule 702's reliability requirements," *Goebel v. Denver & Rio Grande W. R.R. Co.*, 346 F.3d 987, 991 (10th Cir. 2003), and Mr. Martin's process with the exemplar cable met that standard.[16]

Freightliner's argument regarding Mr. Martin's supposed noncompliance

---

[16]     Mr. Martin's comments at the *Daubert* hearing regarding the exemplar truck were not as extensive as those he offered about the exemplar cable. However, for his belief that the exemplar truck was the same model as the subject truck, he relied on his own visual inspection of the burned truck and the photographs, as well as the assurances of his colleague Mr. Birmingham—all reasonable sources for an expert.

with NFPA 921 is as fruitless as its similar argument with respect to Mr.

Birmingham.  Like Mr. Birmingham, Mr. Martin *did* swear that he followed the

recommendations made in NFPA 921, *see* Aplt. App. at 1206–07; as with Mr.

Birmingham, the district court had no evidence to the contrary; and, as discussed,

NFPA 921 is not the be-all and end-all in the reliability of fire investigations, *see*

*Russell*, 702 F.3d at 455 (noting that while "NFPA 921 qualifies as a reliable

method endorsed by a professional organization," it is not "the *only* reliable way

to investigate a fire" (citation omitted) (internal quotation marks omitted)).

Regarding Freightliner's argument that Mr. Martin failed to exclude other

potential sources of the fire outside of the truck, and instead improperly deferred

to his colleague Mr. Birmingham on that point, Freightliner makes no showing

that such deference was improper.  It is not unusual for courts to distinguish

between expert testimony on a fire's cause and expert testimony on a fire's origin.

*See, e.g.*, *Weisgram v. Marley Co.*, 169 F.3d 514, 519 (8th Cir. 1999) (permitting

a fire investigator to testify about the origins of a fire, but not its cause).  Kechi

reasonably points out that Mr. Martin was only there for the former.  *See* Aplt.

App. at 1207 (Mr. Martin testifying at the *Daubert* hearing that Mr. Birmingham

was the origin expert).  As such, his charge was to ascertain how a fire might

have started in the subject truck, not how it might have begun elsewhere in the

shop.  *See id.* at 1207–08 (Mr. Martin observing that Mr. Birmingham completed

the origin investigation).  Freightliner offers no authority suggesting that such a

31

division of labor is inappropriate, and we have no reason to suppose the district court abused its discretion in allowing it. *See, e.g.*, *Hartford Ins. Co. v. Gen. Elec. Co.*, 526 F. Supp. 2d 250, 255 (D.R.I. 2007) (discussing a case involving separate experts on fire cause and fire origin).

Freightliner next characterizes Mr. Martin's theory that the insulation spread the fire as overly speculative. Though expert testimony can properly be excluded as unreliable where it is based on "assumptions . . . that [are] not supported by the evidence," *Truck Ins. Exch. v. MagneTek, Inc.*, 360 F.3d 1206, 1213 (10th Cir. 2004), Mr. Martin's comments on the insulation were supported by his inspection of the incinerated insulation at the scene, his comparison of that insulation with the insulation in the exemplar cable, and his many years of experience studying fires that spread through insulation. The comments of Mr. Martin did not render his proffered testimony unreliable.[17] To conclude, we see no abuse of discretion in the district court's decision to permit Messrs.

---

[17]     In its reply brief, Freightliner focuses on the district court's inconsistency in excluding Mr. Birmingham from discussing the insulation issue but then allowing Mr. Martin to explore the matter from the stand, "even though he admitted numerous times that he was not retained to offer origin opinions." Aplee. Reply Br. at 7. This is not an argument about Mr. Martin's qualifications to testify as an expert, but about what he said while so testifying. Furthermore, as an argument omitted from the opening brief and inadequately discussed in the reply brief, it is not properly presented to us. *See, e.g.*, *Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) ("[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief.").

Birmingham and Martin to testify, and consequently affirm its orders allowing them to do so.

### C

Our final issue concerns the district court's decision to exclude most of Kechi's damages evidence.  Although this ruling presents a closer question, we nonetheless find that—as with the preceding issues—the district court acted properly in this regard.  We therefore affirm its order.

### 1

Kechi offered its damages evidence in the form of lay opinion testimony by Messrs. Day and Caster.  As a matter of federal law, lay opinion testimony is governed by Federal Rule of Evidence 701.  That rule provides that

> [i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701.  Here, the dispute is over subsection (c), i.e., whether Kechi's damages evidence was actually expert testimony and thus inadmissible as lay testimony.  We have explained that Rule 701(c) is covered by the *Erie* doctrine,[21] as it was added to the Rules by amendment under the Rules Enabling Act, 28

---

[21]     *Erie R.R. Co.*, 304 U.S. at 78 ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any [diversity] case is the law of the state.").

33

U.S.C. § 2072, and was therefore not an act of Congress outside *Erie*'s scope. *See James River*, 658 F.3d at 1218.  As such, in the event of a conflict between Rule 701(c) and a state evidentiary rule, the federal rule must yield to its state counterpart unless "application of the federal rule represents a valid exercise of the rulemaking authority."  *Id.* (quoting *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 422 (2010) (Stevens, J., concurring)) (internal quotation marks omitted).  Application of a federal rule is not such a valid exercise where it "abridge[s], enlarge[s] or modif[ies] *any* substantive right."  *Id.* (quoting *Shady Grove*, 559 U.S. at 422 (Stevens, J., concurring)) (internal quotation marks omitted).

Our approach in the case at bar is as follows.  We first inquire whether federal law supports excluding the damages testimony and conclude that, if applied, federal law would counsel in favor of upholding the district court's decision as a proper exercise of its discretion.  We then turn to Kansas law.  If state and federal law are consistent, the evidence could be subject to exclusion under either code.  However, if Kansas law is demonstrably inconsistent with federal law such that it would point toward admission of the evidence, we would ask whether application of the federal rule affects a substantive right—and, if it would not, the federal rule would control, permitting exclusion of the damages testimony.

In this case, however, we are able to resolve the issue at the second step of

34

our analytical process because Kechi has failed to evince *any* conflict between state and federal law. Consequently, we refrain from opining on whether application of federal law affects a substantive right. We likewise abstain from predicting how the Kansas courts would construe the import of their state's law regarding the damages testimony at issue here. *Cf. Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1280 (10th Cir. 2000) (declining to weigh in on a question of state law in the absence of guidance from the state's highest court); *cf. also Royal Capital Dev., LLC v. Md. Cas. Co.*, 659 F.3d 1050, 1055 (11th Cir. 2011) (noting that "an authoritative statement from [a state] supreme court" concerning state law "is much better than a conjectural statement" from a federal court on state law). In other words, absent a showing by Kechi of a federal-state legal incongruity, we are content to operate on the premise that the two codes are consistent and would allow for the same outcome. Thus, crediting the district court's discretionary determination that the testimony of Messrs. Day and Caster was too complex to come in under Rule 701, we affirm its decision that Kechi was not permitted to introduce it.

### 2

Consistent with the framework discussed above, the first predicate question is whether the damages evidence—either as to the real estate or as to the heavy

equipment[18]—was properly excluded under federal law.  In answering this question, we are guided by the settled principle that "[a] district court has broad discretion to [make decisions] under Rule 701."  *United States v. Banks*, 761 F.3d

---

[18]      As indicated in the fact section *supra*, the jury was instructed to assess damages on only three items: (1) the Gator, (2) the property in the Gator, and (3) certain "shop supplies and equipment."  Aplt. App. at 129 (capitalization altered).  Presumably, since the district court allowed the jury to award damages on these three items, while excluding damages testimony as to the other heavy equipment and real estate and likewise omitting any instruction on either, it believed the evidence *was* proper on the three items.  However, Freightliner makes a number of confusing statements that could be read to suggest that it understands the district court to have admitted *all* of Kechi's damages evidence (that is, not just the three items), and that it understands itself to be arguing chiefly for *reversal*.  *See, e.g.*, Aplee. Opening Br. at 1 (framing the issue as "[w]hether the trial court improperly allowed Mr. Day to testify pursuant to [Federal Rule of Evidence] 701 as the alleged 'owner' of the damaged property"); *id.* at 38–39 ("Mr. Day was . . . *permitted* . . . to offer testimony relating to the heavy equipment and personal property that was damaged in the fire." (emphasis added)); *id.* at 39 ("[T]he Trial Court improperly allowed Mr. Day to testify as owner."); *id.* at 40 ("Mr. Day is not an owner of the property . . . , and his testimony *should have been* excluded." (emphasis added)).  Elsewhere, Freightliner appears to acknowledge in passing that the district court excluded at least some of the testimony, but it is entirely unclear what testimony it believes was *admitted*.  In sum, it is impossible to decipher Freightliner's account of the events at trial, though its brief is replete with mistaken suggestions that it largely lost on the damages question when, in fact, it largely won.

Given our institutional "preference for affirmance," *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011), Freightliner's apparent confusion over the district court's exclusion of most of the damages evidence does not affect our analysis of that decision.  It is another matter, however, with respect to the evidence supporting the damages that were awarded.  Because Freightliner would have to seek reversal if it wanted to question the admission of that evidence, and because it fails to make any specific argument to that effect, we will not make an argument on its behalf, *see Yelloweagle*, 643 F.3d at 1284, and will instead affirm the district court's award of damages.  The discussion that follows above does not encompass the items on which damages were awarded.

1163, 1200 (10th Cir.) (quoting *United States v. Garcia*, 994 F.2d 1499, 1506

(10th Cir. 1993)) (internal quotation marks omitted), *cert. denied*, --- U.S. ----,

135 S. Ct. 308 (2014); *see United States v. Goodman*, 633 F.3d 963, 969 (10th

Cir. 2011) (observing the district court's sound "discretion to exclude lay witness

testimony for other reasons contemplated by the Federal Rules of Evidence,

among them . . . Rule 701"); *Gust v. Jones*, 162 F.3d 587, 595 (10th Cir. 1998)

("[T]he admission of lay opinion testimony is within the sound discretion of the

trial court."); *Getter v. Wal-Mart Stores, Inc.*, 66 F.3d 1119, 1124 (10th Cir.

1995) (underscoring the discretionary nature of the district court's "determination

of a lay witness's qualification to testify" under Rule 701).

    Our strong deference to such rulings is grounded in "the trial court's

familiarity with the case and experience in evidentiary matters." *Elm Ridge*

*Exploration Co.*, 721 F.3d at 1213 (quoting *Abraham v. BP Am. Prod. Co.*, 685

F.3d 1196, 1202 (10th Cir. 2012)) (internal quotation marks omitted). Thus,

when assaying for abuse of discretion, we will not unsettle the district court's

decision absent "a definite and firm conviction that the lower court made a clear

error of judgment or exceeded the bounds of permissible choice in the

circumstances." *Headwaters Res., Inc. v. Ill. Union Ins. Co.*, --- F.3d ----, 2014

WL 5315090, at *11 (10th Cir. 2014) (quoting *Phelps v. Hamilton*, 122 F.3d

1309, 1324 (10th Cir. 1997)) (internal quotation marks omitted).

    In finding no abuse of discretion here, we are guided in part by our

reasoning in *James River*.  By way of background, in *James River* we held that the district court committed reversible error when it allowed a landowner to testify to his property's value as a lay witness under Rule 701.  We did so on the basis that this exercise would have required the landowner "to calculate a post-fire estimate of the pre-fire value of a dilapidated, condemned, 39-year old building."  *James River*, 658 F.3d at 1214.  Such calculations, we said, necessitated "[t]echnical judgment" and were based partly on the landowner's experience in real estate and his reliance "on a technical report by an outside expert."  *Id.* at 1214–15.  In other words, we reasoned, this was not a situation where the landowner's "opinions or inferences [did] not require any specialized knowledge and could be reached by any ordinary person."  *Id.* at 1214 (quoting *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 929 (10th Cir. 2004)) (internal quotation marks omitted).  Importantly, we also noted that "the Federal Rules of Evidence generally consider landowner testimony about land value to be expert opinion."  *Id.* at 1215.

To be sure, *James River* did not entirely foreclose the possibility of deeming property-value testimony admissible under Rule 701.  We acknowledged the same in a footnote—*viz.*, that "[a]lthough . . . the Rule 702 advisory committee note point[s] to landowner testimony on value as being expert in nature, with proper foundation, it may *in the appropriate case* be admitted as lay opinion under Rule 701."  *Id.* at 1215 n.1 (emphasis added) (citation omitted).

Yet, in no uncertain terms, we instructed that the district court's inquiry turns on the complexity of the property right at stake and, more specifically, on whether the "valuations [are] based on straightforward, common sense calculations." *Id.* at 1216 (internal quotation marks omitted).

Looking to *James River*, first of all, we are satisfied that the district court operated within a permissible range of discretion in finding that Mr. Day's proffered testimony regarding the heavy equipment at issue was too complex to qualify for admission under Rule 701. The machines involved in this case were large, specialized, expensive pieces of equipment, and Mr. Day's descriptions of them sufficiently show that his opinion of their worth was based upon his specialized, technical, professional experience working with them. *See, e.g.*, Aplt. App. at 315 (Mr. Day explaining his valuation of the lawn mowers with reference to the fact that they "were 25 horse, 60-inch cut. They're all hydrostat. They've got dual cooling on 'em. Dual oil filters."); *id.* at 316 (explaining his valuation of the tractor with reference to the fact that "it was a four-wheel drive, you know, farmers, four-wheel drive, they can put duals, it was equipped ready to put duals on the front and back if you needed to"); *see also* Aplt. Opening Br. at 10–11 (tallying up Mr. Day's estimates of the eight machines' values as in the several hundred thousand dollars range). In short, the district court did not abuse its discretion when it classified Mr. Day's testimony as grounded on technical knowledge of the sort possessed by an expert. By extension, the district court did

39

not abuse its discretion when it ruled that the damages testimony could not come in under the auspices of Federal Rule of Evidence 701.[19]

The testimony as to the valuation of the real estate—which would have been offered by Mr. Day and Mr. Caster—poses a slightly closer question.[20] Unlike the equipment, the real property does not seem to have been particularly complex. *See, e.g.*, Aplt. App. at 249 (Mr. Day describing the building as a "metal pole barn building with double truss wooden rafters. It was approximately 60 by 60 on the main part. And then we had an office on the east side that had a wall partition between it but it was attached and it was also a tin/wood structure."). Nonetheless, we do not believe the district court "exceeded the bounds of permissible choice in the circumstances," *Headwaters Res., Inc.*, 2014

---

[19]     In arguing that Mr. Day was qualified to testify to the value of the equipment under federal law as a lay opinion witness, Kechi emphasizes that Mr. Day was familiar with offers for the purchase of the wheel loader. It offers no caselaw to support its contention that this was sufficient to render him a competent lay witness. Furthermore, the argument deals with only one piece of equipment and does not surmount the bar set by *James River*, which counsels that the technical, specialized nature of an object strongly suggests that its valuation is the proper subject for expert testimony.

[20]     In its initial order on this issue, the district court noted that *James River* dealt with real property and not personal property, which it characterized as "a *big* distinction." Aplt. App. at 94 (Order, filed Jan. 16, 2012). It did not cite any cases drawing such a categorical distinction, and *James River* is based in large measure on the complexity of the object being valued, and not at all on the legal status of the property. *See* 658 F.3d at 1214. As this very case proves, personal property can be just as complex—if not more so—than real estate. We therefore apply the same analysis to both the real and the personal property.

WL 5315090, at *11 (internal quotation marks omitted), by finding the building complex enough that its valuation qualified as a fitting subject of expert testimony. Notably, the *James River* opinion quoted approvingly from a Third Circuit case that held that

> [t]he prototypical example of the type of evidence contemplated by the adoption of Rule 701 relates to the appearance of persons or things, identity, the manner of conduct, competency of a person, degrees of light or darkness, sound, size, weight, distance, and an endless number of items that cannot be described factually in words apart from inferences.

*James River*, 658 F.3d at 1214 (quoting *Asplundh Mfg. Div. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1196 (3d Cir. 1995)) (internal quotation marks omitted). The valuation of the real estate (i.e., the machine shop), as simple as it may have been, was certainly more complicated than the valuation of the items in this list by an order of magnitude. Furthermore, as noted, *James River* emphasized that "the Federal Rules of Evidence generally consider landowner testimony about land value to be expert opinion." *Id.* at 1215. In addition, *James River* specifically highlighted the specialized knowledge required to estimate depreciation after a building is destroyed by fire, *see id.* at 1214 ("Technical judgment is required in choosing among different types of depreciation."), which is exactly the calculation Kechi's witnesses would have been required to make. Finally, Mr. Day indicated that he would be relying in part on an appraisal for his evaluation, much like the "technical report" relied upon by the witness in *James*

*River*, *id.* at 1215—yet another sign that his testimony was unfit for admission pursuant to Rule 701.

To summarize, we are satisfied that the district court properly exercised its discretion in concluding that the valuation testimony—both as to the heavy equipment and as to the real estate (i.e., the machine shop)—was too specialized to qualify as lay witness testimony. *See Goodman*, 633 F.3d at 969 (noting that even if other rationales might support the admission of testimony, "the district court *still has the discretion to exclude* [the] witness testimony" under Rule 701 (emphasis added)). We therefore will not disturb the district court's ultimate determination that this testimony could not be admitted under Rule 701.

**3**

Having concluded that federal law permits the exclusion of the damages testimony, we ask whether Kansas law interposes a conflict. As noted *supra*, however, Kechi has not attempted to argue that Kansas law dictates a different outcome. Reading its briefing very liberally, Kechi hints at a possible federal-state legal conflict, and the ensuing inquiry into the impact of the federal rule on substantive rights, when offering the conclusory remark that invoking federal law "would *abridge* [its] right to present the testimony of Jim Day, as evidence on the damages claim." Aplt. Opening Br. at 26. Even if our liberal construction is on target, Kechi's skeletal allusion is not enough. It is not a legally cognizable argument; rather, it is an unsubstantiated, unexplained, uncited assertion. As

such, we enjoy the discretion to disregard the assertion entirely and proceed on the premise that, for purposes of this case, Kansas law can be harmonized with federal law.  We therefore affirm on that ground alone.  *See, e.g.*, *Bronson*, 500 F.3d at 1104; *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 841 (10th Cir. 2005) (deeming several issues waived when the support for each consisted of "mere conclusory allegations with no citations to the record or any legal authority for support"); *United States v. Rodriguez-Aguirre*, 108 F.3d 1228, 1237 n.8 (10th Cir. 1997) (noting that the appellant bears the burden of tying all salient facts to his legal arguments).

In sum, to return to our starting matrix, it was not an abuse of the district court's discretion to find that the damages testimony could not come in under Federal Rule of Evidence 701, as it was specialized expert testimony that should have been offered pursuant to Rule 702, if offered at all.  Because Kechi has not meaningfully argued that state law would permit the testimony, we conclude that the evidence, *under these circumstances*, was correctly deemed inadmissible. Accordingly, we hold that the district court did not err in precluding Messrs. Day and Caster from testifying as to damages.

## IV

For the reasons presented above, we **AFFIRM** the district court's orders denying Freightliner's motion for JMOL, allowing Kechi's expert witnesses to

testify, and barring Kechi's lay witnesses from testifying as to damages.


Entered for the Court


JEROME A. HOLMES
Circuit Judge